ELIZABETH EDGAR PULITZER v. BENJAMIN G. CHAPMAN, JR., ET AL., Appellants.—85 S. W. (2d) 400.

Court en Banc, July 10, 1935.

*Bryan, Williams, Cave & McPheeters* and *Foristel, Mudd, Blair & Habenicht* for appellants.

302

*T. M. Pierce, Samuel H. Liberman, John H. Overall* and *Ragland, Otto & Potter* for respondent.

ELLISON, J.—This suit was instituted in the Circuit Court of the City of St. Louis in January, 1928, by the plaintiff, Elizabeth Edgar Pulitzer, to contest the will of her aunt, Mrs. Fannie H. Higbee, deceased, on the alleged grounds: (1) that the testatrix lacked testamentary mental capacity; (2) and that the execution of the will was procured through the exertion of undue influence upon the testatrix by two of the chief beneficiaries thereunder, Benjamin G. Chapman, Jr., and Louisa H. Chapman. On a trial in the Circuit Court of the City of St. Louis the jury sustained the will. The court granted a new trial, assigning three reasons: (1) that the verdict of the jury was against the weight of the evidence on the issue as to undue influence; (2) that error was committed in giving to the jury an Instruction No. 2, requested by the defendants; (3) and in refusing to give an instruction marked J, requested by the plaintiffs.

The appeal was argued here in Division Two and an opinion written by the late lamented FITZSIMMONS, C. But owing to the fact that at the time a case was pending before the court en banc bearing on one of the vital issues involved—Loehr v. Stark, which has since

been decided and reported in 332 Mo. 131, 56 S. W. (2d) 772—the instant. cause was transferred to the court en banc and reargued there. The main question now sharply presented to us is whether the order of the circuit court granting to the plaintiff-contestant-respondent a new trial on the ground that the verdict was against the weight of the evidence on the issue of undue influence, can and should be sustained under Loehr v. Stark, supra. This necessitates a rather full review of the evidence in the light most favorable to the respondent.

The will was executed November 20, 1924. The testatrix died in St. Louis on January 18, 1927, when seventy-six years old, leaving an estate valued at about $1,300,000. She was a widow, and left only collateral kin. She had had one brother and two sisters. But of these the brother, Warner M. Hopkins, predeceased her without issue in 1918 leaving a widow, the defendant Lutie C. Hopkins; and one of her two sisters, Mrs. Elizabeth Edgar, died in August, 1924, about three months before the will was made, leaving four daughters, Mrs. Dorothy E. Bennett, the defendants Laura E. Whittemore and Ethel Allen, and the plaintiff, Elizabeth E. Pulitzer. (Mrs. Bennett died in 1928 after the institution of this suit.) The surviving sister of the testatrix, Mrs. Louisa H. Chapman, has three children, Benjamin G. Chapman, Jr., Charles G. Chapman and Louisa C. Bowen. These four may be called the principal defendants in the case. Under the will they get over 90 per cent of the estate, and it is Mrs. Chapman and her son Benjamin who are charged by the contestant with having exercised undue influence which induced the execution of the will. From the foregoing it will be seen if Mrs. Higbee had died intestate one-half of her net estate would have gone to her sister, Mrs. Chapman, and the other half to the four daughters of her deceased sister, Mrs. Edgar, one of whom, Mrs. Pulitzer, is the contestant.

The will, summarized, was as follows:

To the four Edgar girls were left legacies of $5000, each.

To certain remoter relatives and to strangers in blood there were cash bequests aggregating $21,200; and the widow of her deceased brother was given her choice of all household effects. The Y. W. C. A. received a gift of $5000; and to Bethesda, an incorporated charitable institution of the city of St. Louis, the testatrix bequeathed the equivalent in money value (as determined by her executor), of one-half of the trust estate left to her by the will of her uncle, William R. Pye. This bequest was made in obedience to a direction in the Pye will, the value thereof being fixed as of the date of the death of the said William R. Pye in 1889. It amounted to about $50,000.

To the four Chapmans, the devises and bequests were: to Louisa H. Chapman, surviving sister, a certain inlaid table and all jewelry;

to her daughter and son, Louisa C. Bowen and Charles G. Chapman, $5000 each; to Benjamin G. Chapman, Jr., the other son, $10,000, and to his wife, Lucille Chapman, Jr., $5000; further to the two Chapman boys, all of the testatrix's pictures; and finally to such of the four Chapmans as should survive the testatrix equal shares in her residuary estate, provided that if Louisa Bowen, Charles or Benjamin Chapman should not so survive, the share of such decedent should go to her or his children, *per stirpes.*

All gifts and legacies, except the bequest to Bethesda and the residuary legacy, were to be paid in full, any inheritance or other taxes thereagainst to be discharged out of the residuary estate.

There was a contest clause providing that if any of the beneficiaries objected to the probate of the will, or in anywise, directly or indirectly, contested or aided in contesting the will, or any of the provisions thereof, or the distribution of the estate thereunder, the bequest to such beneficiary should be annulled, and he or she should receive only $1.

The defendant Benjamin G. Chapman, Jr., was appointed executor without bond, with power to sell any part of the estate, real or personal, at such prices and upon such terms as he in his absolute discretion might determine, without the approval of the probate court.

Summing up, it will be seen that by her will the testatrix left only $20,000 to her nieces, the four Edgar children; $76,200 to more distant relatives, strangers in blood and institutions, $50,000 of this being paid to Bethesda under compulsion of the will of her uncle, William R. Pye; and over $1,200,000 of her $1,300,000 estate to Mrs. Chapman and her three children, less taxes and expenses of administration.

The evidence indicates that three of the Edgar girls were not in easy circumstances, financially. This was directly proven with respect to Mrs. Whittemore. There was evidence that Mrs. Pulitzer had worked in a shop in St. Louis selling women's apparel, and supported herself from 1921 until shortly before her marriage in 1926; and that Mrs. Allen worked in another shop there in 1924 and 1925. It is to be inferred, further, that Mr. and Mrs. Edgar the father and mother of the four girls, were in no position to leave them anything. Mrs. Edgar was an invalid for ten or twelve years before her death in August, 1924. She received an annuity of $600 under the Pye will. Mr. Edgar retired from business in about 1915 or 1916. The testatrix supplemented with her funds some kind of retirement allowance he was drawing from the company he had worked for. She gave Mrs. Edgar $300 or $350 a month from 1920 until her death in August, 1924, and thereafter continued the allowance to Mr. Edgar.

On the other hand it appears that Mrs. Chapman was rich and her children more than well-to-do. Most of the wealth of both Mrs. Chapman and Mrs. Higbee, the testatrix, came from their uncle

William Pye, heretofore mentioned, who was the husband of a half-sister of their mother. By his will he placed his estate in trust bequeathing substantially one-half thereof to Mrs. Higbee, and, it seems, a like portion to Mrs. Chapman. His estate at the time of his death did not exceed $200,000 in value, but it included some stock of the Burroughs Adding Machine Company which became very valuable. In 1889 the stock was worth about $15,000; by 1918 it and the accumulations thereon had increased the estate to about $3,000,000. The defendant Benjamin Chapman testified Mrs. Higbee and his mother had something in the neighborhood of $1,250,000 derived from Mr. Pye's estate, which we understand to mean that each had that much. In 1919 Mrs. Higbee gave Mrs. Bowen $20,000, and in 1920 she presented to Mrs. Bowen, Charles Chapman and Benjamin Chapman 500 shares each of said Burroughs stock, worth $100 per share, making $50,000 to each. The evidence showed that Mrs. Bowen lived in Detroit and was the wife of Julian P. Bowen who was connected with D. M. Ferry & Company; that Charles Chapman was a partner in a financial house in Detroit; and that Benjamin Chapman lived in St. Louis and had been president of the American Central Insurance Company since 1911.

So much for the relationship between the parties, their comparative means and necessities, and the discriminations in the will. We are stating the facts in the light most favorable to the contestant-respondent. But it is not to be understood the evidence was all one way. The proponents adduced substantial evidence that the testatrix had deep affection for Mrs. Chapman and her three children; that she had sustained a close relationship with them throughout her life; that she did not hold Mrs. Edgar's four daughters in high regard though she had given Mrs. Whittemore $1500 in 1916, $500 in 1918, smaller amounts from time to time, and a monthly allowance of $15, and gave Mrs. Pulitzer $1000 on her marriage in 1926 and $500 another time. There was also evidence that Mr. Edgar, the father of the four girls, had disappointed the Hopkins family because of failures in business; and that Mr. Pye, probably for similar reasons had discriminated against the Edgar branch of the family in his will.

Passing now to the facts more directly bearing on the issue of undue influence. The testatrix was housekeeper for her uncle, William R. Pye, until his death in 1889. She was married a year later to Mr. Higbee and lived with him until his death in 1916. During those years he attended to her business affairs, one witness for appellants, Miss Mary C. Lionberger, stated. More accurately, she said she inferred but did not know that Mr. Higbee was in charge. After his death in 1916, Mrs. Higbee's brother Warner M. Hopkins took over that responsibility. It seems he had been acting for her, in part, in such matters for some years theretofore. But he died

in November, 1918, and for a year or more prior thereto had been in poor health.

During the year 1917 Mrs. Higbee began to call upon the appellant Benjamin G. Chapman, Jr., for assistance in business matters. In the late spring of 1917 when both Mr. Hopkins and Mrs. Higbee were leaving St. Louis for the summer she asked Mr. Chapman to accept a power of deputy for entrance to her safety deposit box so he might conduct any business she should refer to him during her absence. He testified no business was referred to him which required him to enter the box until 1918. She would bring bank checks to him and have him deposit them for her and he would see that her bank account balanced. He assisted her once in 1918 in subscribing for Liberty bonds. In April, 1918, he went with her to her safety deposit box to put away some bonds. She had him read her then will and asked his opinion of it. He criticized certain $100 legacies to some of her relatives as being too small. She requested him to arrange a conference with Judge James A. Seddon, a prominent member of the St. Louis bar, who drew a new will for her. She executed this will in the office of Mr. Chapman in his presence, two officials of his life insurance company acting as attesting witnesses.

Toward the close of 1918 Mr. Chapman canvassed the records left by Warner M. Hopkins and arranged a settlement with his executrix for funds of Mrs. Higbee's which he had held. Mr. Chapman kept track of all of Mrs. Higbee's business and bank transactions after Mr. Hopkins' death but she drew her own checks until 1920. In December, 1919, the Burroughs Adding Machine Company issued certain stock in which its stockholders had subscription rights. He advised with her about it and she decided to subscribe for her quota, 2613 shares. About that time she was stricken with a severe heart attack which confined her to her bed for nearly two months. She executed on January 27, 1920, a general power of attorney appointing the appellant Benjamin G. Chapman as her attorney in fact. He completed the purchase of the stock, borrowing $250,000 from the First National Bank in St. Louis in her name for that purpose.

From 1920 on to Mrs. Higbee's death in 1927, the appellant Benjamin Chapman continued to act as her attorney in fact. The appellants do not dispute that throughout that period he stood in a confidential relation to her and handled substantially all her business except her domestic affairs. It was during the year 1920 that Mrs. Higbee presented to Mr. Benjamin Chapman, to his brother Charles and to his sister Mrs. Bowen, 500 shares each of the stock of the Burroughs Adding Machine Company. In 1924 or 1925 on the suggestion of the appellants, Benjamin and Charles Chapman, Benjamin Chapman sold out all Mrs. Higbee's stock in the Burroughs Adding Machine Company for $840,000. This money they invested in other securities, many of which were purchased through

308

a bond house in Detroit with which Charles Chapman was connected.

Relative to the execution of the will in contest on November 20, 1924. As has been stated, William R. Pye, the uncle of Mrs. Higbee, on his death in 1889 by his will left his estate in trust giving her a one-half interest therein. The Pye will further provided that half of the half interest which he was leaving Mrs. Higbee should be conveyed, transferred or bequeathed by her at her death to the "St. Louis Bethel Association," subsequently incorporated and known as "Bethesda," or that it should be appropriated to some other charitable purpose she might select. In 1918 Judge James A. Seddon, heretofore mentioned, brought a suit in the Circuit Court of St. Louis to construe the Pye will, in which suit a decree was rendered declaring that the half interest in the testatrix's share of the Pye trust estate which she was required by the Pye will to leave to Bethesda or other charity, should be ascertained and valued as of the date of the death of William R. Pye in 1889. This was important because of the subsequent enormous increase in the value of the Pye estate due to the increment derived from the stock in the Burroughs Adding Machine Company. The trustees named in the Pye will back in 1889 were Benjamin G. Chapman, Sr., the husband and father of Mrs. Chapman and her three children, and Warner M. Hopkins, the brother of the testatrix. Benjamin G. Chapman, Sr., died in 1923 and Warner M. Hopkins in 1918. The appellant Benjamin G. Chapman, Jr., was appointed trustee under the Pye will subsequent to the death of said two testamentary trustees.

Judge Rhodes E. Cave, another prominent member of the St. Louis bar, the scrivener of Mrs. Higbee's will here in contest, testified that in 1924 he was consulted by the appellant Benjamin G. Chapman, Jr., with reference to his power as trustee under the Pye will to make a sale of certain land belonging to the Pye estate. As a part of that employment it became necessary for Judge Cave to examine the Pye will and the circuit court decree of 1918 construing the same. On finding that said decree provided the part of Mrs. Higbee's share in the Pye trust estate which the Pye will required her to leave to charity should be valued as of the date of Mr. Pye's death in 1889, it occurred to Judge Cave that this might cause litigation after her death over the question as to what the Pye estate was worth at that remote date. He therefore suggested that Mrs. Higbee select the charity to which she would leave the bequest and agree with such donee or legatee upon the value in money of the interest it was to receive—in other words, to fix the value in dollars and cents of the interest at the date of the death of Mr. Pye.

He testified he asked Mr. Chapman to communicate this suggestion to Mrs. Higbee and thereafter was informed by Chapman that she desired to have a conference with him. Judge Cave discussed the matter with her. Mr. Chapman was present at the conference, which

lasted thirty or forty minutes, but did not participate therein. Mrs. Higbee consented to the arrangement. Bethesda was selected as the charity to receive the bequest and in due course a written contract was executed by Bethesda, Mrs. Higbee and Mr. Chapman as trustee under the Pye will, wherein the value of the whole Pye trust estate in 1889 was fixed at $200,000, and binding Mrs. Higbee to leave the money equivalent of a half of her one-half interest in the estate to Bethesda on that basis. On cross-examination Judge Cave said he did not recall whether he took the contract out to Mrs. Higbee for execution or whether he sent it through Mr. Chapman.

After the agreement had been reached with Bethesda, but before it had been reduced to writing and signed as a contract, Judge Cave told Mrs. Higbee it would be necessary for him to see her will to make sure that it made provision for Bethesda as agreed upon. He called upon her at her apartment and she produced for his inspection a will which she had made in 1923. Judge Cave found that in this will Mrs. Higbee had already named Bethesda as beneficiary of the charitable bequest she was to make in obedience to the Pye will, but he advised her he would prefer to redraft that part of the will so as to give her executor power to fix the money value of the bequest to Bethesda (which he would do in accordance with the agreement with Bethesda, and thereby give effect to the agreement in a manner binding on all other legatees in her will). Mrs. Higbee consented and said she wanted to make some other changes in the will in minor respects, particularly because her sister Mrs. Edgar had died (in August, 1924) since the 1923 will was made. Judge Cave said Mrs. Higbee further inquired if it was customary to put in a will a provision that anyone contesting it should not take under it. He stated he told her it was sometimes done, and she said she wanted to have such a clause inserted. Thereupon he took the 1923 will, with a memorandum of the changes she desired, redrafted it and submitted it to her. She requested one or two other changes, after which the will here in contest was drawn in final form. From first to last Judge Cave had four or five conferences with the testatrix, extending over a period of two or three months.

On direct examination he said no one was present at any time when he discussed with Mrs. Higbee the contents of her will, except the two attesting witnesses on the occasion when she executed the will in suit—in other words, none of the Chapmans were present. On cross-examination he said he did not think Mr. Chapman was present when he (Judge Cave) discussed her will with her and she showed him her 1923 will. Counsel for the respondent thereupon called Judge Cave's attention to a deposition he had given earlier in the year where the following question and answer appeared: "Q. On the occasion when she gave you the will was he there? A. He was there, I am quite sure." Judge Cave agreed he had been asked the

question and had made the answer shown, but said he was mistaken in so answering, and that his recollection now was that Mr. Chapman was not present.

With reference to the execution of the will in contest. Judge Cave testified that after the will had been drawn in final form either his office called up Mrs. Higbee or he asked Mr. Chapman to see whether it would be convenient for him to go out and see her. On cross-examination he said he did not know whether Mr. Chapman made the appointment with her, but he thought his (Judge Cave's) office did. Counsel for respondent then called attention to the deposition Judge Cave had given and to these questions and answers therein. "Q. Who made the appointment on the occasion when you took the witnesses out—who made this appointment, do you know? A. My recollection is I telephoned Mr. Chapman. Q. Mr. Benjamin G. Chapman, Jr.? A. That I had prepared the will and would be ready to go out that night and have it executed and asked him if he would telephone her and tell her we would be out there. That is my recollection." At the trial, after Judge Cave had thus been referred to his deposition, he said he still was unable to recall whether he telephoned Mr. Chapman or whether his own office telephoned Mrs. Higbee. Whichever way it was done, Judge Cave continued his narrative in his direct examination by saying that about six o'clock in the evening of November 20, 1924, he went to Mrs. Higbee's apartment taking with him Mr. McPheeters, a member of his firm, and Mr. Orr, a younger lawyer in their office. He went over the will with her, showing where changes had been made in conformity with her request, and she signed it in the presence of him, Mr. McPheeters and Mr. Orr. They in turn signed as attesting witnesses. He then delivered the will to Mrs. Higbee and he, Mr. McPheeters and Mr. Orr left. As they went out Mr. Chapman came in the entrance to the apartment, but they just passed the time of day with him.

Judge Cave said that after Mrs. Higbee's death Mr. Chapman inquired whether he, as executor, could make distribution of the cash and specific legacies contained in her will, and he advised Mr. Chapman that he could, and prepared forms of receipts for him. But in doing so Judge Cave said he had no thought that if the beneficiaries accepted and receipted for their legacies they would be cut off from contesting the will; it never occurred to him that there would be a contest until the suit was filed. Mr. Chapman on this point fixed the time when the receipts were sent out as being February or March, a month or two after Mrs. Higbee's death. He said he thought by having the money paid before June 1 he would save taxes for the estate.

Messrs. Thomas S. McPheeters and Isaac C. Orr the two other attesting witnesses merely testified to the execution of the will and to

Mrs. Higbee's apparent sound mental and physical condition at the time. They said (as did Judge Cave) that she was not in bed but up, walking around and talking to them in a normal way for a person of her age. They also stated that as they were leaving Mrs. Higbee's apartment they met Mr. Chapman coming in. Mr. McPheeters could not recall whether it was after they opened the door to leave, or as they were going downstairs, or as they were going out (of the building). Mr. Orr thought it might have been in the hall outside the door of Mrs. Higbee's apartment. Mrs. Jennie Pavlick, Mrs. Higbee's nurse, a witness for the appellant, said she remembered the occasion of the execution of the will. A deposition she had given also was introduced in evidence by appellant in which Mrs. Pavlick stated that after Judge Cave went out, following the execution of the will, Mr. Chapman came in from the outer door of the apartment; "that the young men and Judge Cave went out together, and as they went out Mr. Chapman came in; that he rang the bell."

The testimony of the appellant Benjamin G. Chapman, Jr., relative to the making of the contested will generally coincided with that of Judge Cave. He said that as trustee of the Pye estate he consulted Judge Cave in 1924 with reference to the sale of certain real estate, and that in the course of that employment Judge Cave suggested the making of the contract with Bethesda. Mr. Chapman testified he arranged a conference between Judge Cave and Mrs. Higbee and was present thereat; that Judge Cave suggested her will be made to conform with her agreement with Bethesda; that Mrs. Higbee requested him (Chapman) to get her will out of her safety deposit box and bring it out to her, which he did; that he knew about Judge Cave's visiting Mrs. Higbee with reference to the will, but that he was not present at any other conversation between the two. He said he knew Mrs. Higbee had made the will because he met Judge Cave and the two other attesting witnesses as they were leaving her apartment that evening, and they said they had just witnessed her will. He further testified that Mrs. Higbee handed him the will and asked him to put it in her box; but she said nothing about its contents except that it contained a provision according with the agreement made with Bethesda. He said that before Mrs. Higbee's death he was ignorant of the provisions of all her wills except the one she showed him in 1918 at the bank, as heretofore recited.

It is contended by the respondent that there is substantial evidence in the record showing the testatrix, Mrs. Higbee, had suffered a heart attack from a disease called myocarditis on the morning of the day the contested will was executed. She had been subject to these attacks recurrently in rather severe form, at least after 1920. Dr. Brooks, her regular physician, who was called as a witness by the appellant, testified she had such an attack on November 20, 1924. His

record did not show what time of day he called on her on that date, but he did make daily visits from November 20 to November 27 and then intermittently to December 4, twelve calls in all. He did not remember whether she was in bed when he saw her on November 20, but he required her to go to bed on such occasions and remembered that she was in bed the next day, November 21. The treatment further included hypodermic injections of digitalis. Leslie Lindsey, the testatrix's colored chauffeur, testified that on the morning of the day Messrs. Cave, McPheeters and Orr came out to have Mrs. Higbee's will executed she was in bed sick; that Dr. Brooks had been there to treat her about nine or ten o'clock that morning. However, she was up and dressed by three o'clock in the afternoon. Mrs. Jennie Pavlick, the nurse, testified on cross-examination that Dr. Brooks had called to see Mrs. Higbee about nine o'clock in the morning the day the will was made and gave her a hypodermic of digifoline, a heart stimulant. However, in Mrs. Pavlick's deposition, which, also, the appellants introduced as heretofore stated, she said Mrs. Higbee was well on November 20, 1924, and was not visited that day by Dr. Brooks.

The proponents did not follow the usual course of limiting their initial showing to prima facie proof of the due execution of the will and of the testamentary capacity of the testatrix, and then letting the contestant come forward with her evidence. On the contrary, nearly all the facts stated in the preceding paragraphs were brought out on direct or cross-examination while the proponents were making their prima facie case. And in addition they showed that between 1916 and 1923 Mrs. Higbee had made three wills and two codicils before the will in contest was executed, in all of which she left her residuary estate to Mrs. Chapman and her three children. These facts were testified to at length by Judge James A. Seddon, the scrivener, the purpose of proponents being to establish that in 1916 before the appellant Benjamin H. Chapman, Jr., sustained a confidential relation to Mrs. Higbee, she acted independently and from then on until her death had a fixed intention to leave the bulk of her estate to the Chapmans.

The first will was dated December 8, 1916. A codicil followed on February 1, 1917, which made two unimportant changes and added a provision that all taxes on all the legacies in the will (except two) should be paid by the estate of the testatrix. The next will was made on May 2, 1918. A codicil to this will was drawn on April 25, 1923, but never executed. Instead, two days later Mrs. Higbee made another will, heretofore mentioned as the will of 1923. About eighteen months later the will here in contest was executed.

The 1916 will made a bequest of $5000 to Mrs. Higbee's brother Warner M. Hopkins, of $5000 to her sister Mrs. Edgar, mother of

the four Edgar girls, and of $5000 to Benjamin G. Chapman, Sr.,
husband of her sister, the appellant Louisa H. Chapman, and father
of the appellants, the three Chapman children. There were also
legacies to all the beneficiaries named in the contested 1924 will, except
that a legacy of $1000 to a Mrs. Mary Starcke in the 1916 will was
omitted in the 1923 and 1924 wills, and a $2000 legacy to the nurse,
Mrs. Jennie Pavlick first appears in the 1923 will, this legacy being
increased to $5000 in the 1924 will. In this last will also a gift of
$200 to the chauffeur Lindsey, was included for the first time. But
in the 1916 will the legacies to Mrs. Pulitzer, Mrs. Allen and Mrs.
Bennett, three of the Edgar girls were only $100 each. The bequest
in that will to Mrs. Whittemore, the remaining daughter of Mrs.
Edgar, was $1000. The cash bequests in the 1916 will to the ap-
pellants, the three Chapman children and to Lucille Chapman, wife
of Benjamin G. Chapman, Jr., likewise were only $100 each, as were,
also, the amounts given the testatrix's two cousins, Miss Kate Miller
and Mrs. Fisher. But the residuary estate, as we have stated above,
was left by the 1916 will to the appellants Mr. Chapman and her
three children.

There is only one bit of evidence indicating that any of the Chap-
mans had anything to do with the making of the 1916 will. Judge
Seddon testified that he dealt with the testatrix alone in drawing it,
and that she specifically declared her intention to leave her residuary
estate to the Chapmans. In the course of his cross-examination counsel
for the respondent called his attention to the following question and
answer in a deposition he had given the year before: "Q. Do you
recall whether anyone else came with her to your office at that time?
A. Well, I am not positive about when Mrs. Chapman came with her;
whether she came with her when she executed the will of 1918, or at
that time, but my best recollection is that she came there in 1916
with her sister, Mrs. Chapman." Judge Seddon admitted he had
been asked that question and made that answer, but said that upon
reflection his independent recollection was that Mrs. Chapman came
with Mrs. Higbee to his office neither in 1916 nor in 1918, but in 1923
when he drew a will for her that year. The fact that led him to this
conclusion was that he remembered Mrs. Chapman was in deep mourn-
ing at the time and her husband had died about a month earlier.
He died in 1923.

The will of May 2, 1918, increased the bequest to Warner M.
Hopkins from $5000 to $10,000; to his wife Lutie C. Hopkins from
$1000 to $5000; to Mrs. Edgar, from $5000 to $10,000; to Benjamin
G. Chapman, Sr., from $5000 to $10,000; to Mrs. Whittemore from
$1000 to $5000; to the three other Edgar girls from $100 each to
$5000 each; to Mrs. Bowen and Charles Chapman from $100 each to
$5000 each; to Benjamin G. Chapman, Jr., from $100 to $10,000, and
to his wife, Lucille, from $100 to $5000; to Miss Kate Miller and Mrs.

Miller from $100 each to $5000 each. Otherwise the 1916 and 1918 wills were substantially the same.

On the question whether the Chapmans had anything to do with the making of the 1918 will. As we have already stated briefly the appellant Benjamin H. Chapman, Jr., testified that on an occasion in April, 1918, when he and Mrs. Higbee were at her safety deposit box she showed him her 1916 will and asked his opinion of it. He further said he told her the $100 legacies to her relatives were rather insignificant, more or less of an insult; that if he were making a will he would either leave a substantial sum to the beneficiaries or nothing. Mrs. Higbee asked him to arrange a conference with Judge Seddon and he did so, escorting her to the attorney's outer office and leaving her there. He thought she took the will with her; at any rate he knew she was going to talk to Judge Seddon about the will. Judge Seddon testified that when she came on this occasion she was unaccompanied. Then he said he did not remember whether Benjamin Chapman brought her, but that if he did he did not stay. Judge Seddon wrote the 1918 will and sent it to the appellant Benjamin Chapman with the following letter, dated May 1, 1918:

"My dear Ben: I am sending herewith the draft of the will of Mrs. Higbee. Kindly go over it with her and see if it is in good shape and conforms to her wishes. When she is ready I will be glad to make an engagement with her for its execution. I am sending also herewith the former will, together with the memorandum which you left with me.".

The foregoing testimony of Judge Seddon was brought out by appellants in his direct examination while he was on the stand as their witness. He said he could not recall any memorandum left with him by Chapman, as the letter stated, and could find none in his file; and that he received no suggestions from anyone except the testatrix. On cross-examination he said Chapman evidently left the memorandum mentioned in the letter though he did not recollect it; that he sent the will to Chapman because he knew Chapman frequently saw his aunt, was on very intimate terms with her, and would take it to her; and that he asked Chapman in the letter to go over the will with the testatrix because he wanted it to conform to her wishes.

The appellant Benjamin Chapman said he thought Judge Seddon telephoned him to ascertain if he would be in his office at a certain hour; that he wanted to send over a draft of her will; that Judge Seddon's stenographer brought to him the letter and an envelope to deliver to Mrs. Higbee, which he did; that he received the letter on the day of its date; that he could remember nothing about leaving any memorandum with Judge Seddon, and did not discuss the will with Mrs. Higbee. However, he testified she brought the will to his office and said she wanted to execute it. She did this in his presence, using two members of the staff of his insurance company as attesting wit-

nesses. This was the day after Judge Seddon had sent his letter of May 1; the will was dated May 2. Mr. Chapman could not remember whether Mrs. Higbee put the will in her bank box or whether she had him do it. Afterward he saw an envelope marked "will" in the box.

In April, 1923, Mrs. Higbee consulted Judge Seddon about drawing a codicil to her 1918 will. It seems the chief reasons for making a change were that her brother Warner M. Hopkins and her brother-in-law Benjamin H. Chapman, Sr., had died. Judge Seddon prepared the codicil revoking the bequests to Mr. Hopkins and Mr. Chapman, Sr., and making a few other changes of a minor nature. He indorsed a memorandum on the codicil, as contained in his file, "April 25, '23. Delivered to B. G. Chapman, Jr., for Mrs. Higbee." Mrs. Higbee did not execute it but decided to make a new will. Two days later she brought the original 1918 will to Judge Seddon and he noted thereon the parts to be changed. This instrument was introduced in evidence. On one of these two occasions Mrs. Chapman accompanied Mrs. Higbee to Judge Seddon's office but it was his recollection that she withdrew while he talked to Mrs. Higbee. Mrs. Chapman had a will made at the same time. On Judge Seddon's copy of Mrs. Higbee's new 1923 will, he made a memorandum "April 27, '23. Delivered to B. G. Chapman, Jr., for Mrs. Higbee." Mrs. Higbee came to Benjamin Chapman's insurance company office and executed this will in his presence, using two of his office staff as attesting witnesses. She gave it to him to put in her bank box. He did not read the will and she did not discuss it with him.

We have already reviewed the evidence concerning the execution of the 1924 will here in contest. It was substantially identical with the 1923 will except: in an increase of the legacy to Mrs. Pavlick, the nurse, from $2000 to $5000; a gift of $200 to the chauffeur, Lindsey; in the more careful wording of the residuary clause; in the elaboration of the clause bequeathing the legacy to Bethesda and giving the appellant Benjamin Chapman, as executor, power to fix the value thereof; and in the addition of the clause penalizing any legatees who might contest the will by cutting them off with $1.00.

I. The appellants' principal assignment of error is that the trial court erred in granting a new trial on the ground that the verdict of the jury sustaining the will was against the weight of the evidence on the issue of undue influence. In passing on this assignment we are limited to an inquiry whether there was any substantial evidence to sustain the trial court's action. It is not within our province to weigh the evidence as a whole and determine the issue for ourselves. We can interfere only if we find no verdict for contestant on the evidence would be allowed to stand. [Security State Bank of

Elvins v. Natl. Security Co., 333 Mo. 340, 344, 62 S. W. (2d) 708, 709, and cases there cited.] Evidence favorable to the proponents must be disregarded, Fowler v. Fowler, 318 Mo. 1078, 1084, 2 S. W. (2d) 707, 709—unless it be of such nature as to be binding on the liti- gants on both sides.

II. Mrs. Chapman and her three children received the bulk of the testatrix's estate under the contested will. It is conceded that the appellant Benjamin G. Chapman, Jr., stood in a fiduciary relation to the testatrix when the will was made in November, 1924. Under some of the earlier decisions of this court these facts alone would have raised a presumption that the execution of the will was procured through the exercise of undue influence upon the testatrix by the fiduciary beneficiary. But in the recent case of Loehr v. Stark, 332 Mo. 131, 144, 56 S. W. (2d) 772, 777, mentioned at the beginning of this opinion, this court en banc overruled these earlier decisions, and held that such presumption does not arise unless, in addition to proof of the fiduciary relation and of a benefaction to or in the interest of the fiduciary, there be further facts and circumstances in evidence from which it can be inferred that the fiduciary beneficiary was active in some way which caused or assisted in causing the execution of the will.

Relying on this decision as authority, the appellants contend, first, that there is no evidence in this record showing either Mrs. Chapman or Benjamin G. Chapman, Jr., was active in any way which caused or assisted in causing the execution of the contested will. And in this connection they say the expression ''execution of the will'' within the meaning of the above rule, does not refer to its mere mechanical execution (as where a beneficiary assisted a testator by acting as messenger to get the attorney who drew the will, Campbell v. Carlisle, 162 Mo. 1. c. 647, 63 S. W. 1. c. 704; Doherty v. Gilmore, 136 Mo. 1. c. 419, 37 S. W. 1. c. 1128; or searched for and found title papers de- sired by testator's lawyers while drawing his will, Sehr v. Lindemann, 153 Mo. 1. c. 291, 54 S. W. 1. c. 541); but means the moulding and making of the will as it was made. This the appellants say Mrs. Chapman and Benjamin did not do; and that there is no evidence of it in the case. The contestant asserts there is such evidence.

The undisputed evidence shows that the appellant Benjamin G. Chapman, Jr., arranged and attended a conference between the tes- tatrix, Mrs. Higbee, and his attorney, Judge Cave, having for its pur- pose the effectuation of a plan whereby the money value of a bequest which she was required by the will of her uncle William R. Pye to leave to Bethesda or other charity could be fixed by agreement be- tween her and such charity. While Mr. Chapman in so doing may have been acting in his capacity as trustee under the Pye will yet

the fact remains that this arrangement was for the benefit of the testatrix's residuary legatees. Mrs. Higbee had the right under the Pye will to substitute some other charity for Bethesda and therefore was in a position to exact a favorable agreement from the latter. Whatever was saved by the arrangement would redound to the benefit of her estate. In connection with this transaction the matter of rewriting her will was discussed. The appellant Chapman testified that the testatrix asked him to get her then (1923) will from her safety deposit box and bring it out to her, and that he did so. He said he knew Judge Cave was conferring with her about her will, but that he was not present at any such conferences. Judge Cave testified on direct examination that Mrs. Chapman was not present when he talked with her about her will and she showed him her 1923 will; but on cross-examination a part of a deposition he had given in this case sometime during the preceding year was read to him, in which he had testified under oath that he was quite sure Mr. Chapman was present on that occasion. He admitted the questions were asked and his answers given as shown in the deposition.

Judge Cave further testified on direct examination that after he had drawn the will—the will here in contest—either his office called up the testatrix and made an appointment with her for its execution, or he made the appointment through the appellant Chapman—he thought the former. On cross-examination he admitted that in his deposition he had said: "My recollection is that I telephoned Mr. Chapman . . . that I had prepared the will and would be ready to go out that night and have it executed and asked him if he would telephone her and tell her we would be out there. That is my recollection." Judge Cave and Messrs. McPheeters and Orr, his partner and office associate, respectively, did go out about six o'clock that evening and the will was executed. As they were leaving the appellant Chapman appeared. He testified they told him they had just witnessed her will. When he went into the apartment the testatrix handed him the will and asked him to put it in her bank box. There was evidence that the testatrix had suffered a heart attack that morning severe enough to require her to be under daily treatment for a week. In our opinion the foregoing evidence was sufficient to show activity upon the part of the appellant Chapman in the execution of the contested will within the meaning of the rule announced in Loehr v. Stark, supra.

Appellants say the above statements made by Judge Cave in his deposition can be received only to impeach his testimony at the trial; that they cannot be accepted as substantive proof of the facts deposed helping out the contestant's charge of undue influence; and that without this proof the contestant failed to make a case for the jury on that issue. It is true the rule generally is said to be that prior contradictory statements of a witness may be shown only for

the purpose of impeachment. [28 R. C. L. sec. 219, p. 633; 70 C. J., sec. 1339, p. 1153; 82 Am. St. Rep., p. 39, note; 21 Ann. Cas., p. 1238, note.] The reason assigned, where any is given, is that if such statements were taken as proof of the facts stated the testimony would be hearsay. [70 C. J., sec. 1339, p. 1155; Culpepper v. State, 4 Okla. Cr. Rep. 103, 111 Pac. 679, 140 Am. St. Rep. 668, 682, 31 L. R. A. (N. S.) 1166, 1175-6; Medlin v. County Board of Education, 167 N. C. 239, 241, 83 S. E. 483, 484, Ann. Cas. 1916E, 300, 302; Matter of Moore, 96 N. Y. Supp. 729, 733, 109 App. Div. 762.] But how can it be maintained that prior direct statements of fact made by a witness in a deposition taken in the case on trial are hearsay? The witness was under oath when the deposition was given; the litigants on both sides then had opportunity to examine him on the issues; and he confronts the court and both parties may examine him again at the subsequent trial concerning his former statements. This more than meets the requirements of the hearsay rule. [3 Wigmore on Evidence (2 Ed.), sec. 1362, p. 3 et seq., sec. 1389, p. 79; State v. Brown, 331 Mo. 556, 560, 56 S. W. (2d) 405, 407; Minea v. St. Louis Cooperage Co., 179 Mo. App. 705, 716, 162 S. W. 741, 744.]

Some decisions indicate a view that contradictory former statements made by a witness merely tend to show the witness spoke falsely or forgot one time or the other, that is, when he made the former statement *or* when he gave the testimony contradicted, and for that reason cannot be accepted as proof of the facts stated but go only to impeachment. That cannot be true, for if it were it would apply to the litigants themselves—and the rule is universal that prior inconsistent statements of a party to an action, by deposition or otherwise, are admissible against him as substantive evidence in the nature of admissions. Furthermore, the party calling the witness vouches for his credibility and will not be heard to say the statements convict him of false swearing. [70 C. J. sec. 991, p. 793; State v. Hulbert, 299 Mo. 572, 574, 253 S. E. 764, 766.] Proof of the contradictory statements may tend to show the memory of the witness was faulty. Certainly no more than this can be affirmed here of a witness of such high standing at the bar as Judge Cave. But the former statements are entitled to some weight as establishing the facts stated—that is why they tend to discredit the witness—and the jury have the undoubted right in the light of all the evidence to find which version of the facts is correct. With reference to the actual probative force of such conflicting statements (made by an honest witness) it is said in 22 Corpus Juris, section 533, page 443 that "Any discrepancy in the testimony of a witness testifying on different trials of a cause should be resolved in favor of the earlier testimony, the transaction then being fresher in his mind."

It is true also that under our statutes the testimony of a witness given at a former trial of a cause (Sec. 1714, R. S. 1929) or by depo-

sition therein, can be used at a subsequent trial only when the witness is dead, absent from the jurisdiction, etc. [Sec. 1780, R. S. 1929.] Speaking generally, the same was true at common law. But this is only to secure for the party detrimentally affected the right of confrontation—that is, the right to require the witness, if available, to face the jury and submit to cross-examination. [3 Wigmore on Evidence (2 Ed.), secs. 1395, 1396, p. 93 et seq.] And, as we have said, notwithstanding the statute the deposition of a party to a cause always may be used against him as an admission whether he is present and ready to testify at the trial or not. [Bogie v. Nolan, 96 Mo. 85, 90, 9 S. W. 14, 15.] So, too, the deposition of a witness may be admitted in evidence to impeach him, as appellants concede. [70 C. J., sec. 1267, p. 1073.] And when the deposition is so used for impeachment the adversary litigant does not lose the right of confrontation because he can examine the witness at the trial.

Considering all these facts, since the former sworn statements of the witness in the same cause not only tend to discredit him, but have probative value and meet the hearsay rule as well, including the right of confrontation, we can see no reason why, in the interest of justice and the elicitation of the truth, the statements should not go to the jury for what they are actually worth, on the same principle that allows statements made by a witness on cross-examination contradicting his testimony on direct examination to be received as substantive proof of the facts stated. To say such former statements may be considered as impeaching testimony but not as substantive evidence is to make a distinction without a difference. As the Supreme Court of North Carolina observed in Medlin v. County Board of Education, 167 N. C. l. c. 241, 83 S. E. l. c. 484, Ann. Cas. 1916 E, l. c. 302, a jury could not be expected to comprehend the distinction between the effect of a contradictory statement as impeaching evidence and as substantive evidence.

While, as we said in the beginning, the rule is generally stated to be the other way, there is some authority for the conclusion we have reached—and going even further. In 2 Wigmore on Evidence (2 Ed.), section 1918b, 460, Prof. Wigmore maintains there is nothing to prevent a tribunal from giving substantive credit even to *extra-judicial* contradictory statements made by one who later testifies at a trial. And, in United States ex rel. Ng Kee Wong v. Corsi, 65 Fed. (2d) 564, the United States Circuit Court of Appeals (Second Circuit) declared the rule was "an artificial doctrine" and held that a transcript of the earlier sworn inconsistent testimony of a witness before a special board of inquiry of the Bureau of Immigration could be received by the board *in another .case* not only to impeach the witness but also as affirmative proof of the facts stated.

We shall not attempt to lay down a rule going beyond the facts of this case. But we do hold that prior inconsistent sworn statements made by a witness in a deposition in the same case, and used to impeach his testimony at the trial, may be accepted as substantive proof of the facts stated, so far as they are competent and have probative value. On this proposition Berry v. Peacock Coal & Development Co., 253 S. W. 456, 460 (13), decided by the Kansas City Court of Appeals in 1923 is in point. The plaintiff there sued for personal injuries sustained when a large clod of frozen earth rolled against him while he was working in a strip pit from which coal was being taken by a steam shovel. The defendant's employee who operated the steam shovel testified at the trial that he did not see the clod of earth on the bank and did not know when or how it fell. In a deposition given in the cause before the trial he had testified that he did know the clod was there and that he left it where it was. In considering the sufficiency of the plaintiff's evidence it became necessary for the Kansas City Court of Appeals to determine whether these admissions made by the witness in his deposition could be accepted as substantive evidence. The court said:

"It is said that the deposition taken before the trial hereinabove referred to cannot be considered by the jury as any proof of the statements therein made, but only as affecting the witness's credibility. This, however, is untenable. The statements were made under oath and as evidence in the case; they were in a deposition regularly taken in this case, and the deposition was offered and received in evidence without objection or limitation in any way."

In the instant case the deposition of Judge Cave was not offered in evidence, but the pertinent parts thereof were read to him and he admitted their authenticity. The testimony was received without objection, or limitation or request for such. We think the Berry case correctly declares the law applicable to the facts here. But in order that we may not be misunderstood we hold further that even if an attempt had been made by proponents to limit the effect of Judge Cave's deposition to mere impeachment, it would have been futile, and that the parts of the deposition mentioned, as proven by the witness's admissions, were competent as substantive evidence.

■ III. The next contention of the appellants is that even if it be granted the aforesaid evidence showing a fiduciary relation between the testatrix and the appellant Benjamin G. Chapman, Jr., and activity on his part in the making of the contested will, ordinarily would have been sufficient to take the plaintiff's case to the jury on the issue of undue influence, still it fell short of doing so here because of appellants' further showing that the testatrix, Mrs. Higbee, had previously made other wills in 1916, 1918 and 1923, in

all of which she left her property substantially as she did in the 1924 will in contest giving the Chapmans the great bulk of her estate. Appellants say the evidence establishes that the fiduciary relation between the testatrix and Mr. Chapman did not begin until 1920 long after the 1916 and 1918 wills were made; and they assert that in these circumstances as a matter of law no presumption of undue influence can arise, citing Wendorff v. Mo. State Life Ins. Co., 318 Mo. 363, 369, 1 S. W. (2d) 99, 101, and other cases of similar import, which hold that when the proof is documentary or all the evidence points one way there is no issue of fact to be submitted to the jury.

We are unable to agree with appellants. Loehr v. Stark, 332 Mo. l. c. 142, 56 S. W. (2d) l. c. 773, holds the presumption of undue influence arising from proof of a fiduciary relation in a will contest is not a mere procedural rule but rests on a substantial basis of fact or inference. The opinion goes on to say, ''Hence the presumption with its underlying facts or inferences, once being in the case, never does or can disappear but raises an issue for the jury.'' It is unnecessary for us to consider whether this rule admits of exception when all the evidence is documentary or the whole proof on both sides points one way and shows no undue influence was used, because all the evidence in this case is not documentary, and does not point one way. Indeed, the three former wills made by Mrs. Higbee were not documentary evidence in the sense contemplated by the Wendorff and other like cases. This is not a suit to *construe* the former wills. They were admitted only as demonstrative evidence tending to show a state of mind—a fixed intention on the part of the testatrix to leave her property as she did in the contested will. And while competent for that purpose yet they stood on the same footing as prior oral declarations of the testatrix showing a like intent. [Thompson v. Ish, 99 Mo. 160, 171, 12 S. W. 510, 512, 17 Am. St. Rep. 552, 556; Lindsey v. Stephens, 229 Mo. 600, 617, 129 S. W. 641, 645; Thomas v. Thomas, 186 S. W. 993, 999 (10); Yant v. Charles, 219 S. W. 572, 574 (3); Blochowitz v. Blochowitz, 122 Neb. 385, 398, 240 N. W. 586, 592, 82 A. L. R. 949, 958, 966, annotation.]

Appellants further point to a number of will cases decided in this and other jurisdictions which they say support their contention. The Missouri cases are: Jackson v. Hardin, 83 Mo. 175, 184; Mayes v. Mayes, 235 S. W. 100, 106; Bushman v. Barlow, 316 Mo. 916, 948, 292 S. W. 1039, 1053. We cannot see that they help appellants. In each of them, it is true, a former will of the testator similar to the one in contest was introduced and it was held there was no evidence of undue influence warranting the submission of that issue to the jury. But no one of these cases ruled that proof of

the former will overcame or destroyed other evidence tending to show undue influence. On the contrary, in each case this court held there was no substantial evidence of undue influence anywhere in the record. In the Bushman case the former will had been made only about three and one-half months before the execution of the contested will, and this court declared that fact was "of more than persuasive force." But the opinion did not say the evidence was conclusive. Instead, in summing up the opinion held: "Her subsequent purpose and intention in this regard having been shown to be the same in the present will as in the former one *tends to show* that the latter was not the result of undue influence." (Italics ours.)

The cases from other jurisdictions cited by appellants are: In re Estate of Hayes, 55 Colo. 340, 351, 135 Pac. 449, 453, Ann. Cas. 1914C, 531, 535; Perkins v. Perkins, 116 Iowa, 253, 263, 90 N. W. 55, 58; Powers' Exr. v. Powers, 21 Ky. Law Rep. 597, 52 S. W. 845; Walton's Estate (Knowles' Appeal), 194 Pa. St. 528, 534, 45 Atl. 426, 429; In re Young's Estate, 33 Utah, 382, 392, 94 Pac. 731, 735, 17 L. R. A. (N. S.) 108, 116, 14 Ann. Cas. 596, 599, 126 Am. St. Rep. 843, 852; In re Jordan's Estate, 126 Wash. 609, 612, 219 Pac. 2, 3. The Hayes case, from Colorado, says the proof of the former similar will there introduced was "of special importance." The Perkins case, from Iowa, said it was "strongly significant." The Powers case, from Kentucky, declared it was "of very great importance," and that "it demonstrated a fixed purpose." The Jordan case, from Washington, said the evidence "shows" the contested will was not the result of undue influence. But none of these cases, as we read them, ruled, or intended to rule, that such evidence is conclusive as against other substantial evidence tending to show undue influence.

The Walton case, from Pennsylvania, does sustain appellants. In that case a fiduciary relation existed between the testatrix and a beneficiary who received a large benefaction under the contested will; and there was proof that he had procured the preparation and execution of the will. The Supreme Court of Pennsylvania said if nothing further had been shown the burden would be cast on the fiduciary to disprove undue influence. But there was uncontradicted evidence that four years earlier the testatrix had executed another will of her own volition in which she gave one of the contestants less and the fiduciary more than they received in the contested will. The court said: "In view of these circumstances the rule affecting confidential agents taking benefits under wills which they have prepared or caused to be prepared does not prevail, and we are of opinion that the learned court below was entirely right in refusing its application."

The Young case from Utah also is stressed by appellants. It says:

''Where a contest is based upon duress, fraud, or undue influence, the provisions contained in a former will may become very important. If it can be shown that the bequests in favor of the person who is charged with having exerted the undue influence are the same, or substantially so, in the later will as they were in the former one, and that the influence was not present when the former will was made, it may be a conclusive answer to the charge of undue influence.'' However, we are persuaded from a reading of the whole opinion that the decision means nothing more than that such evidence might be regarded by a jury as conclusive. The case does not hold proof of the voluntary execution of a former similar will always is sufficient, of itself, to overcome other substantial evidence tending to prove undue influence and authorize the withdrawal of that issue from the jury. The question before the court was whether such evidence was material.

The contestant argues that the burden of showing the three former wills were *not* procured by undue influence rested upon the proponents who offered them to prove the contested will was executed voluntarily. And there is an intimation to that effect in Bushman v. Barlow, 316 Mo. 1. c. 948, 292 S. W. 1. c. 1053, where it was said the failure of a contestant to object to the introduction of a former will offered for like purpose amounted to a tacit concession that no improper influence had induced its execution. But the law does not go that far. The cases in this State, and generally (68 C. J., secs. 462, 476, pp. 773, 794) impose no such condition on the admission of former similar wills in evidence. They are competent for what they are worth without further proof by the proponents that the testator was free from undue influence when he made them. But we hold that even where such showing is made the former wills are not conclusive that the will in contest was voluntary, where there is substantial evidence in the case to the contrary.

The probative value of such evidence depends upon a number of things. As is said in Muller v. St. Louis Hospital Assn., 5 Mo. App. 390, 400, it diminishes in importance with the lapse of time, and at last has no value at all. Conditions may have changed. The estate of the testator may be worth substantially more when the contested will was executed than it was when the former will was made. The situation of the objects of the testator's bounty, or his feelings toward them, may be different. Without the exertion of undue influence a beneficiary might be unable to preserve in a later will the favored status given him in an earlier will.

In the instant case we think the circumstances were different. While we agree with appellants there is no substantial evidence showing Mrs. Higbee's 1916 will was procured by undue influence, yet the proponents' own showing discloses that Benjamin G. Chap-

man, Jr., had some connection with every will and codicil she made after that; particularly is this true of the 1918 will. There is ground for inference that the value of her estate increased substantially after the 1916 will was made. The stock of the Burroughs Adding Machine Company, as Judge Seddon testified, which was worth only about $15,000 in 1889, had risen to the value of $3,000,000 in 1918. Toward the close of that year, through the appellant Benjamin G. Chapman, Jr., the testatrix borrowed $250,000 to purchase 2613 shares of that stock. In 1919 she gave Mrs. Chapman's daughter, Mrs. Bowen, $20,000; and in 1920 she presented the three Chapman children with 500 shares each of the Burroughs stock, worth $50,000. In 1924 or 1925 she sold out all her stock holdings at $120 per share for $840,000. All this increased the value of that part of the estate passing to the Chapmans under the residuary clause of the will, since all the other legacies were fixed in amount. In the 1924 will here in contest, a clause was added penalizing any legatees who might contest the will. The will was executed on the morning of the day when the testatrix had suffered a heart attack. Considering all these facts in connection with the presumption arising from the fiduciary relation, we think the evidence most favorable to contestant made more than a substantial showing that undue influence induced the execution of the will, though, of course, we do not attempt to pass on the weight of the evidence.

■ IV. One of the reasons assigned by the trial court for granting a new trial was that error was committed in giving an instruction, No. 2, requested by appellants. The court said it was of the opinion that the instruction did not embody all the elements necessary to define testamentary capacity. The part of the instruction bearing on that question is as follows:

"The court instructs the jury that soundness of mind, as used in this and other instructions, means no more than the ability to understand and comprehend what one is doing, and the general character of one's property, and the persons who reasonably come within the range of one's bounty, and it is not necessary that one have a perfect and complete understanding of these matters in all their bearings nor be able to deal with intricate and complicated matters, but only that one be able to comprehend and understand the ordinary, as distinguished from the complicated, affairs of life."

Appellants maintain the instruction was proper and cite a number of decisions of this court running back from the latest ones for more than sixty years. Thus in Williams v. Lack, 328 Mo. 32, 43, 40 S. W. (2d) 670, 675, Division One, quoting from Sanford v. Holland, 276 Mo. 457, 469, 207 S. W. 818, 820, said: "The standards and tests of mental capacity to make a will have been so repeatedly an-

nounced in this State and are so firmly established that it is hardly necessary to refer to citations. A testator with mind enough to understand the ordinary affairs of life and the kind and extent of his property and who are the natural objects of his bounty and that he is giving his property to the devisees mentioned in his will in the manner therein stated, is capable of making a will under the law of this State.'' Other cases giving similar definitions are: Meyers v. Drake, 324 Mo. 612, 631, 24 S. W. (2d) 116, 123-4; Berkemeier v. Reller, 317 Mo. 614, 642, 296 S. W. 739, 752; Hahn v. Hammerstein, 272 Mo. 248, 259, 198 S. W. 833, 836; Holton v. Cochran, 208 Mo. 314, 410, 106 S. W. 1035, 1064; Knapp v. St. L. Trust Co., 199 Mo. 640, 663, 98 S. W. 70, 77; Riggin v. Westminster College, 160 Mo. 570, 579, 61 S. W. 803, 805; Harvey v. Heirs of Sullens, 56 Mo. 372, 379-80.

Instruction No. 2 here seems to conform generally to the outlines set by the foregoing cases. But one thing is to be noted: the instruction says soundness of mind means *no more* than, etc. The use of the words ''no more'' in a similar instruction was criticized in Hartman v. Hartman, 314 Mo. 305, 313, 284 S. W. 488, 490, and we think that criticism is just. Also the instruction only required the testatrix to have capacity to know ''the general character'' of her property. This hardly comes up to the requirement of the earlier cases. Their formula usually is that a testator must have capacity to know the general nature and extent of his property. This Instruction No. 2 seems to have been taken practically verbatim from the opening part of an instruction set out in Post v. Bailey, 254 S. W. 71, 73. But the instruction in that case went on to say ''and therefore'' if the jury believed from the evidence that the testator at the time of executing his will had sufficient mind and memory to know (among other things) ''the general value, nature and character of his property.''

In the two particulars just pointed out we think appellants' Instruction No. 2 was faulty. But that is not the big question raised by the parties with respect to the instruction in their briefs here. [7] In addition to giving the foregoing Instruction No. 2 at the request of the proponents, the court also gave another instruction, No. VIII, on testamentary capacity at the request of the contestant, as follows:

''That if a person has not mind and memory enough to understand, without the aid of others, the value, nature and extent of her property, the number and names of the persons who are the natural objects of her bounty, their deserts with reference to their conduct and treatment of her, their capacity and necessity, and if she does not have active memory enough to retain all these facts in her mind long enough to prepare her will, she does not have the mental or testamentary capacity required by law to make a valid will.''

This latter definition first appeared in Crum v. Crum, 231 Mo. 626, 638, 132 S. W. 1070, 1073, and has been approved in a number of cases since, the latest of which are Hartman v. Hartman, 314 Mo. 305, 313, 284 S. W. 488, 490; Smarr v. Smarr, 319 Mo. 1153, 1165, 6 S. W. (2d) 860, 863; Schoenhoff v. Haering, 327 Mo. 837, 850, 38 S. W. (2d) 1011, 1016.

In the Hartman case, decided en banc, the court found itself in the same situation that confronts us here. There an instruction had been given for the proponents substantially like Instruction No. 2 in this case, and another instruction had been given for the contestants substantially like respondent's Instruction No. VIII in this case. The Hartman opinion held that the more general form of instruction (like Instruction No. 2 here) was defective because it failed to require the jury to find that the testator had sufficient mental capacity "to know the number and names of the natural objects of his bounty, *their deserts with reference to their conduct toward and their treatment of him, their capacity and necessities*" (italics the court's), which did appear in the more specific instruction before it (like Instruction No. VIII here). And the court asked this question, "Which instruction did the jury follow?" This amounted to a holding by clear implication that the more specific form of instruction embodying the definition of testamentary capacity first given in the Crum case was proper and that the more general forms of definition approved by this court in cases as late as Williams v. Lack, 328 Mo. l. c. 43, 40 S. W. (2d) l. c. 675, are prejudicially defective because of the omissions just pointed out. That is the theme of the respondent-contestant's argument on this appeal. The ultimate question is whether the Hartman case en banc has overruled all these other decisions containing more general definitions of testamentary capacity, handed down through a period of more than half a century before it was decided, and invalidated divisional opinions of similar import delivered since.

We think not. In the Crum case the court was attempting to give a general definition of testamentary capacity "satisfying the judicial mind;" it was not dealing with an instruction to a jury containing such language. In fact, there is no reported case in which an instruction employing that language appears until the Hartman case came along sixteen years later. That the court did not consider it was announcing a new doctrine, but regarded the definition merely as an elaborated equivalent of what had been said many times before, is apparent from what follows immediately after the definition. The opinion continues: "Such in effect is the doctrine of this court as gathered from a line of cases such as (citing 6 cases). In some of these cases the definition of testamentary capacity is shortened, one judge using one form of words and another another; but when analyzed the language imports what we announce. To make a will

a person must know what he is about and what he wants to do with his property, and to know those things he must have a mind of the character indicated in the definition.'' This is further made clear by the fact that the six cases cited by the court in support of its definition included Holton v. Cochran, supra; Knapp v. St. L. Trust Co., supra; Riggin v. Westminster College, supra; and Harvey v. Heirs of Sullens, supra, all of which give only general definitions of testamentary capacity similar to the one contained in Instruction No. 2 in the instant case. Neither of the other two decisions cited in the Crum case contained a definition of testamentary capacity.

As a matter of fact, if there be fault in either instruction in this case respondent's Instruction No. VIII is open to question quite as much as appellants' Instruction No. 2. It tells the jury without qualification that a testator must have mind and memory enough to understand without the aid of others the value, nature and extent of his property, and to retain all these facts in mind long enough to prepare his' will. A testator is not required to have mental command of the detailed facts concerning his affairs—if it were so, but few men of large estates and diversified interests could measure up to the standard. Further the instruction enumerates particularly that a testator must be similarly able to understand the *number* and *names* of the persons who are the natural objects of his bounty, their *deserts* with reference to their *conduct* and *treatment of him*, their *capacity and necessities.* It has been said in one case, at least, that such requirements, put in an instruction, have a tendency to lead a jury to believe it is their province to say whether the testator made what they conceive to be a proper disposition of his property. [Couch v. Gentry, 113 Mo. 248, 256, 20 S. W. 890, 892.] Whether or not it be true that the definition of testamentary capacity in the Crum case and in Instruction No. VIII is the legal equivalent of the more general definitions appearing in many other cases, it does not follow that the definition may be put bodily in an instruction. Some instructions, correct as abstract statements of the law, have been held to minimize the evidence of a litigant in a will contest, Post v. Bailey, 254 S. W. l. c. 74. In the same way they can magnify and exalt.

V. The trial court assigned as another reason for granting a new trial that it believed it should have given Instruction J requested by the proponents. This instruction was as follows:

''The Court instructs the jury that the certificate of the witnesses attached to the paper writing, purporting to be the last will and testament of Fannie H. Higbee, and the certificate of the Probate Court admitting the same to probate, are not any evidence that said paper writing was the last will and testament of Fannie H. Higbee,

328

but are admitted for the sole purpose of showing that the provisions of the law requiring that said paper writing should first be presented to the Probate Court in the county in which the testatrix lived at the time of her death, have been complied with.''

We are unable to see that the refusal of this instruction was error. Such an instruction was given in Munday v. Knox, 321 Mo. 168, 183, 9 S. W. (2d) 960, 965, but this court did not pass on it. The will would have been void if it had not been attested by the subscription of the attesting witnesses. [Sec. 519, R. S. 1929.] It was a necessary element of the proof to show the due execution of the will, and in that sense did tend to prove it was her *will*. The instruction tells the jury the certificate of the attesting witnesses *and* the certificate of the probate court admitting the same to probate were admitted for the sole purpose of showing compliance with the law requiring the will to be presented first to the probate court. We fail to see how the attestation of the witnesses could be any proof of that fact.

For the reasons assigned in paragraphs II, III and IV of this opinion the judgment of the circuit court granting a new trial is affirmed and the cause remanded.

All concur, except *Coles, J.*, not sitting.