Albert E. CARLSON, Appellant,

v.

The FIRST NATIONAL BANK OF KANSAS CITY, Missouri, a Corporation, Carl A. Carlson, Laura Carlson, Jack Allan Carlson and Elmer W. Carlson, Respondents.

No. 48765.

Supreme Court of Missouri,

Division No. 2.

April 9, 1962.

Wm. Harrison Norton, Williams, Norton & Pollard, North Kansas City, for appellant.

Dick H. Woods, John C. Noonan, Stinson, Mag, Thomson, McEvers & Fizzell, Kansas City, for respondents.

BARRETT, Commissioner.

This action to contest a will was filed on March 8, 1956, and when it was tried almost five years later, January 23, 1961, a jury returned a verdict in favor of the will, and the contestant has appealed. When Clarence (Swede) K. Carlson executed his will on May 2, 1944, he was single (his wife died in 1940) and had no next of kin or relatives other than the parties to this litigation. Swede died on February 15, 1955, age 49, and by his will devised his one half interest in a farm to his sister-in-law, Laura Carlson, wife of Carl. The remainder of his property he bequeathed, provided they did not contest the will, one third to his brother Elmer, one third to his brother Albert and one third to his sister-in-law Laura and his nephew Jack. The contestant is the brother Albert and the proponents are Carl, who originally was executor and is not a beneficiary directly, the present executor and the other named beneficiaries.

The alleged grounds of the contest were lack of capacity and undue influence by Carl. The contestant has filed an elaborate brief in which he has detailed all the evidence and, despite his disclaimer, the general purport of his argument is that the jury's verdict upholding the will is against the weight of the evidence. But, admittedly, there was substantial evidence in support of the verdict and this court may not set the judgment aside as against the weight of the evidence. Nearns v. Harbert, 25 Mo. 352, 355; Whitacre v. Kelly, 345 Mo. 489, 494, 134 S.W.2d 121, 124; Pickett v. Cooper, 354 Mo. 910, 914, 192 S.W.2d 412, 413. The contestant failed to adduce any evidence of undue influence. As to capacity to execute the will it is sufficient for the purposes of this opinion to say that there was evidence that Swede Carlson was an alcoholic, that he may have used some narcotics, that he was a "manic-depressive," and, before his marriage in 1938, he may have had a venereal disease. In short, there is evidence to support the inference that he lacked the capacity to execute the will. But, as indicated, that issue has been resolved, and the three points briefed and argued as entitling the contestant to a new trial are that the court erred (1) in excluding certain evidence, (2) in refusing to permit the introduction of a deposition and (3) in refusing permission to cross-examine a witness as hostile.

As to the latter point, the contestant called as a witness Robert Nichols who had once worked at the Standard Laundry (owned by the Carlsons) and had known Swede for twenty years. After examining Nichols at some length, the witness readily answering all questions, counsel suddenly announced that they desired to examine him as a hostile witness, particularly with reference to a "sworn" statement. In the course of a colloquy one of contestant's counsel said "that just a minute ago I noticed a strong odor of alcohol on his (Nichols) breath. I don't know whether that has anything to do with it or not, but I have no reason to think that he wouldn't

answer the same questions in the same manner that he gave them to us." The statement is here, it is not a "sworn" statement, it is an unsigned question and answer statement dated December 16, 1957. In some important respects Nichols' statements were based entirely on hearsay; as to whether Swede was addicted to narcotics, "just by hearing other people talk." In some respects his statements were mere conclusions based upon insufficient factual background: "Q. You don't think he was capable of making a will? A. No." In any event, at the point counsel stopped in his examination of the witness there was no indication that he was hostile. He had testified that Swede "drank a little," in the statement he had said "quite a bit," and the last question was whether the witness noticed any difference in his drinking when the witness came back to Kansas City on a vacation and he said, "Not too much, no," the answer in the statement was "He seemed to be drinking more when I came back" in 1943 on a vacation.

■ Counsel said they had no reason to believe that Nichols' testimony would differ from his statement, but, as the court pointed out, there was no showing that he had seen the statement since 1957 or that counsel had since talked to him. There was no explanation of why the statement was unsigned, and the witness was testifying to matters and events seventeen years previously. The plain fact of the matter was that contestant was simply not getting the desired or expected answers from Nichols. But the fact alone that the answers of the witness were not all that contestant expected, and modified or differed from an unsigned statement given three years previously, did not make him a hostile witness, or as a matter of right entitle disappointed counsel to cross-examine him with respect to the statement. There are circumstances in which an entrapped party may cross-examine or impeach his own witness, as when a prior statement of the witness is also supported by a deposition. Malone v. Gardner, 362 Mo. 569, 242 S.W.2d 516. But in that case

the trial court exercised its discretion and permitted the cross-examination, while in this case the court exercised its discretion and denied the request, and the problem here is whether the court unjustly or unfairly exercised its discretion.

■ The general rule is that a party may not call a witness and then impeach his testimony, either by cross-examination or a prior contradictory statement, merely because his evidence turns out to be unfavorable or unsatisfactory. Crabtree v. Kurn, 351 Mo. 628, 646, 173 S.W.2d 851, 858; Burnam v. Chicago G. W. R. Co., 340 Mo. 25, 42, 100 S.W.2d 858, 867. Here the witness readily answered all questions, counsel had received two answers that were not as favorable as desired, but the witness was not then or later examined as to the really material facts (Malone v. Gardner, supra), and, if qualified to express an opinion, no one knows what his answer might have been upon the truly essential issue of Swede's capacity to execute a will in May 1944. In the circumstances of this record, particularly the noted imperfections in the statement itself, it is not manifest that the court abused its discretion in denying counsel's request to cross-examine Nichols as a hostile witness. 58 Am.Jur. (Witnesses), Secs. 792, p. 437, 800, p. 445; 98 C.J.S. Witnesses § 477(b), p. 358.

The appellant's first point, that the court erred in excluding "certain evidence," has to do with the deposition of Marie Jones. Marie was an old friend of Swede's wife who died in 1940, and for the next three or four years Swede occupied a room in the apartment of Marie and her then husband, Charles Hutson. Marie left Kansas City in 1944 and was in Alaska for eleven years, later in Los Angeles, and her deposition was taken in 1960. In the first place, her entire deposition was not rejected, objection was sustained to certain specific questions and answers and large sections of the deposition were read in evidence. In the second place, the appellant "did not offer this evidence necessarily for the truth of the statements and declarations made by the person involved, but because these declarations amounted to conduct inconsistent with that of a rational, sane person," in other words, it was "to show or indicate the condition of the mind of the deceased testator, not necessarily to establish the truth of the statements made."

It would unnecessarily encumber this opinion to detail Marie's history and her deposition, consequently illustrations will have to suffice. One of the factors the contestant attempted to establish was that his brother was addicted to narcotics. Marie did not purport to have or to testify to firsthand information. "Q. Now, did you at any time know of him using narcotics? A. Well, when you say did I know it, I never actually saw, I know he called the doctor. It was my impression that is what he was doing, and his wife." Immediately following, this was her explanation, "I know sometimes he would be very nervous and he would want to call the doctor and my husband would try to get him not to, but he would and they (Swede and the doctor) would go in the back room. I wasn't in there, I can't say what happened." In further explanation of her "impression" Marie said, "When we was living with his wife sometimes he would be out riding and he would have to stop and see a doctor and she would object because (s)he said that he was getting dope, and she was so worried." When it came to the crucial issue of Swede's capacity this was the repeated question, "From your conversation with him and your observation of him, would you say that in your opinion he was competent to make a will, make a distribution of his property?" And the answer, "I wouldn't think so, myself."

■■ It is not objected that Marie was not permitted to testify to Swede's capacity to make a will, it is said that she "of course, could not testify as a lay witness and give an opinion as to the sanity of the deceased, Clarence Carlson, without first relating facts including acts as well as declarations

that were inconsistent with the behavior of a rational, sane person." But, it should be noted in passing, the question put to Marie, "would you say that in your opinion he was competent to make a will, make a distribution of his property," was not the proper manner in which to elicit the desired response. Gillmore v. Atwell (Mo.), 283 S.W.2d 636, 639; Fields v. Luck (Mo.), 44 S.W.2d 18, 21; 2 Page, Wills, Sec. 790, p. 548. It is permissible to adduce evidence, even certain hearsay perhaps, of a testator's mental condition both before and after the execution of a will (29 Am.Jur. (Insane Persons), Sec. 137, p. 259; 20 Am. Jur. (Evidence), Sec. 585, p. 491), but such evidence "is of no probative value unless it raises a reasonable inference as to mental condition at the time of signing the will." Whitacre v. Kelly, 345 Mo., 1. c. 494, 134 S.W.2d 1. c. 124. All the witnesses agree that Swede was in bad health all his life, he had arthritis, a gall bladder operation, he was nervous and under the care of doctors and institutions for years. But the fact that he would see a doctor and then be "relaxed" or all right for the time being is not particularly. forceful proof of his mental condition when the will was executed in May 1944.

■ Marie's testimony has not been set forth in detail, *but his wife's objections* (as testified to by Marie) to his seeing a doctor, or what his wife said are not declarations of the testator indicative of his mental condition or evidence from which his state of mind could be inferred when the will was executed. 6 Wigmore, Evidence, Secs. 1714, p. 57, 1734, p. 106; 2 Page, Wills, Sec. 810, p. 592. One of Swede's own statements rejected by the court was this: "Q. Did he ever say anything about having been in the Army or having been called to the Army? A. Well, he was supposed to have went over to Leavenworth to take his test or whatever it was, anyhow he said that they said he was crazy. He made a joke out of it. Q. Do you know when that was, or about when? A. No, I can't tell you that. Of course, he made a joke out of everything." Not only was Swede a noted practical joker, one of his difficulties was that he refused to take anything, even life, seriously, so all the witnesses agreed. In any event, Swede did not make a declaration that he was crazy, according to Marie he said that "they said he was crazy." Even so, "a direct assertion by a testator that he *was at a past time sane or insane* stands on no better footing than any other hearsay assertion; it is not admissible under the present Exception, (Testator's Statements) because it does not assert a present mental condition." 6 Wigmore, Evidence, Sec. 1740, p. 130. Again, in view of the specific complaints here and the purposes for which, assertedly, the evidence was offered, it may only be said that the court did not manifestly err to the contestant's prejudice in rejecting these particular parts of Marie's deposition.

In addition to claiming that his brother was an alcoholic and a drug addict, the contestant also attempted to prove that he had once had a venereal disease. And, as indicated, there was some evidence from which one could draw the inference that at some time in his life he had suffered from a venereal disease of some type. Dr. Major did not treat Swede but he said that an examination in 1939 revealed that he had "gonorrheal arthritis." There was, however, no evidence of probative force that he had ever had syphilis. The proponents' evidence, particularly that of Dr. Graham, the family physician and Swede's doctor for about thirty years (the doctor referred to by Marie Jones), was that he had "a bad heart lesion" and arthritis, but he said that he definitely did not have "gonorrheal arthritis." In all the years he saw no symptoms of any venereal disease and no evidence whatever of syphilis. And he was of the opinion that if Swede had ever had a venereal disease there would have been residual symptoms and he would have discovered them.

Swede died February 15, 1955, and an autopsy was performed by Dr. Hill, a

pathologist. After the case was closed by the proponents, the contestant proposed to read in rebuttal the deposition of Dr. Hill. Dr. Hill's report shows that "Death is apparently due to congestive heart failure due to free aortic regurgitation on the basis of valvular insufficiency." It was the doctor's opinion, in the deposition, that "the changes we saw were best interpreted as being due to syphilis." Particularly in the first centimeter of the aorta, "This condition might indicate syphilis in the aorta." When asked whether the condition he found could have occurred within a comparatively short time before death, Dr. Hill said, "I have no idea on that." He thought there was no active syphilis at the time of death, but whether it had been something of long standing, he said, "I could only speculate about the time." As to time in general, "I think it would mean that the disease had been present for a few years," but as to how many, "I couldn't say on that—a year and a half or ten and a half. I don't feel competent to say." He said it might take as many as five years to develop, "I think it could be five or seven." As to whether it could have been ten years, "I just can't answer that." And on cross-examination he conceded as another possibility that the condition he found could have resulted from other causes than a possible syphilitic infection.

█ The contestant's third point is that the court erred in rejecting this rebuttal evidence, "Rebutting evidence is admissible to explain or repel evidence given by the opposing party." The contestant admits that Dr. Hill's evidence, the autopsy having been performed eleven years after the execution of the will, was not of sufficient probative force to have been admissible in his case in chief: "It would seem obvious that the condition of syphilis found by the doctor who performed the autopsy eleven years after the date of the execution of the will would have no probative value to prove that the deceased had syphilis at the execution of the will." Nevertheless, the contestant contends that the

evidence was admissible in rebuttal to contradict and thus impeach Dr. Graham and that because of its rejection he is entitled to a new trial. On the other hand, the proponents contend that the attempt to thus impeach the testimony of Dr. Graham involved a collateral matter and that therefore the court did not abuse its discretion in rejecting the deposition of Dr. Hill.

The contestant had some evidence that Swede had once had a venereal disease of some kind, according to Dr. Major, gonorrhea, but, as indicated by the point he makes here, there was no probative evidence that he had ever had syphilis. In his autopsy Dr. Hill did not examine the brain and so there was no evidence of "meningo-vascular syphilis." The significant thing about all of the contestant's testimony as to venereal disease is that there was no evidence whatever that any venereal disease the testator may have had had any bearing on his capacity to execute a will in May 1944. Thus the only point to Dr. Hill's deposition was that it tended to contradict and thus impeach Dr. Graham's testimony that Swede Carlson had never had a venereal disease of any kind. And, since the appellant had no evidence of syphilis, the effect of Dr. Hill's deposition was simply to contradict Dr. Graham upon an issue as to which there was in point of fact no material contest. Nevertheless, since the deposition was contradictory of Dr. Graham's testimony and therefore had some bearing on his credibility, it is assumed that it would not have been improper for the court to have admitted the testimony in rebuttal. McCormick, Evidence, Sec. 47, p. 100; 58 Am.Jur. (Witnesses), Sec. 782, p. 432; 98 C.J.S. Witnesses § 629, p. 646; 32 C.J.S. Evidence § 571, p. 411. However, as this deposition plainly illustrates, such contradictory evidence does but little "probatively," particularly upon the essential issue of the testator's mental capacity to execute a will in 1944, it only shows, if believed, that Dr. Graham may have been "in error on a particular point." 3 Wigmore, Evidence, Sec. 1000, p. 652. It is not neces-

sary to consider whether Dr. Hill's deposition involved a "collateral matter" (Frechin v. Thornton (Mo.), *326* S.W.2d 122; 3 Wigmore, Evidence, Sec. 1021, p. 694), it is sufficient to again say, in these detailed circumstances, particularly in view of the essential issues and the state of the proof, that the court did not manifestly abuse its discretion in excluding the deposition. Burgess v. Garvin & Price Merc. Co., 219 Mo. App. 162, 272 S.W. 108; 32 C.J.S. Evidence § 571, p. 411.

As indicated as to each of the three points urged, none was manifestly prejudicial as to any matter "materially affecting the merits of the action" (Sup.Ct. Rule 83.13, V.A.M.R.) and, therefore, the judgment is affirmed.

BOHLING and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by BARRETT, C., is adopted as the opinion of the Court.

All of the Judges concur.