STATE of Missouri, Respondent,

v.

Lee Burl DAVIS, Appellant.

No. 59779.

Supreme Court of Missouri,
En Banc.

April 28, 1978.

Blair K. Drazic, Asst. Public Defender, St. Louis, for appellant.

W. Mitchell Elliott, Asst. Atty. Gen., Jefferson City, for respondent.

## PER CURIAM:

After the Court of Appeals, St. Louis District, handed down an opinion written by Simeone, J., we ordered transfer of the cause to this court because of the one novel issue involved, i. e., whether or not a trial court may call a witness as the court's witness in a criminal case. After considering that issue as well as others presented, we agree with the result reached by the Court of Appeals and adopt the opinion thereof without benefit of quotation marks.

### I

#### Introduction

Defendant-appellant, Lee Burl Davis,[1] was charged, tried and found guilty by a jury and sentenced to life imprisonment for the offense of murder in the first degree.

§ 559.010, RSMo 1969. He appeals. For reasons hereinafter stated, we reverse the judgment of conviction and remand the cause for further proceedings.

The principal issues raised on this appeal are (1) whether prior inconsistent statements made by a witness called by the court as the court's witness were used as substantive evidence by the prosecutor in closing argument, and if so, whether the use of such evidence as substantive evidence constitutes "plain error"; (2) whether the trial court may call a witness as the court's witness in a criminal case—an issue heretofore unresolved in this state; and, having done so, (3) whether the trial court erred in permitting the prosecutor to "impeach" the court's witness by the use of prior contradictory statements made by the witness and statements made by the prosecutor at an earlier guilty plea proceeding, which statements implicated the defendant-appellant in this proceeding.

This case presents a bizarre set of facts and presents complex legal issues:

### II

#### The Facts

The abbreviated facts for the disposition of the principal points on appeal can be briefly stated—more detailed facts will follow. Mr. Joseph "Hector" Lane was found dead in an automobile, having been shot. The appellant, Lee Burl Davis, was charged with the offense. Mr. Jahmel Imrod Moore pleaded guilty to the offense sometime prior to the trial of the appellant, Davis. During this trial, Moore was called as the court's witness, and, after denying that he or the appellant was implicated in the crime, the state impeached Moore by reading the statements of the prosecutor and Moore at Moore's guilty plea and introduced the testimony of Rhonda O'Neal, a state's witness, all of which contradicted Moore's "direct" testimony at trial.

It is this introduction of the contradictory testimony and the comments thereon by the

---

1. Also known as Burl Lee Preston and Lee Burl Preston.

prosecutor in closing argument which essentially form the basis of this appeal.

Much of the evidence detrimental to the defendant was related by the state's witness, Leonard O'Neal. The tragic events begin on the rainy night of June 18, 1973. On that evening, Leonard O'Neal and Harold Davis were at the home of their young friend, Mark Bowers. Later in the evening, the three left the Bowers home and walked to the home of Harold Davis, where Harold's brother, Lee Burl Davis, also lived. The Davises lived in the 4200 block of Holly Avenue in the City of St. Louis. At the time of their arrival, Lee Burl Davis was not there. The three young men—Mark, Harold and Leonard—watched TV. Sometime after eleven p.m., Harold's seven-year-old sister came in and told them that an automobile accident had occurred outside the house. No shots were heard, but the impact of the accident was heard by other neighbors, including Nathaniel Phillips and Anthony Lee Bailey. The three young men, Mr. Phillips and Anthony Bailey, together with others, went out to the street. When they arrived, they saw that an Oldsmobile "98" had hit an automobile which in turn hit another and then hit a tree. The "98" motor was running, and a man—Joseph Lane (also known as Hector)—"was bent over the wheel with his foot on the gas." Mr. Phillips and Anthony Bailey took Mr. Lane out of the car and placed him on the street. Mr. Phillips took Mr. Lane's pulse, but there was none.[2]

Within minutes, Officer Walter Meissert was summoned to the area because of a "fire." When he arrived, the firemen were already present. He saw that "the car that struck the first car was smoking from the radiator," but there was actually no fire. "Hector" Lane had already been taken out of the car and placed on the ground. Officer Meissert found no weapons either in or outside the automobile.

According to Leonard O'Neal, the three young men stayed around the accident scene for a short while and then went back into the Davis home. When they went back into the house, a telephone call was made by a friend of Leonard's—Jahmel Imrod Moore—a witness called by the court at this trial of the appellant. While the call was not for Leonard, he did participate in the conversation. From the Davis house, Leonard, Mark and Harold went to Leonard O'Neal's house, which was "[o]ne block over." There Leonard saw Jahmel Imrod Moore. Leonard's sister, Rhonda O'Neal, was also present. Leonard testified at trial that at the O'Neal home he saw blood on "[a]ll portions" of Moore's shirt. At this time, the appellant, Lee Burl Davis, was not present at the O'Neal home. From the O'Neal home, Leonard, Mark, Harold and Jahmel Moore, after visiting the house of "Tony" Bailey, went to the mother's home of a friend—Debra Kent. When they arrived, the appellant-Davis, Debra and Debra's mother were present.

At Debra's house, Leonard said, ". . . We told [Davis] that Hector was killed." But Davis had no reaction. After staying at the Kent house about five minutes, the group then decided to return to the Davis house. They were walking. In the group were Mark Bowers, Leonard O'Neal, Harold Davis, Jahmel Moore and the defendant, Lee Burl Davis. Mark and Harold were walking in one group, and Leonard, Jahmel and Lee Burl Davis were walking in another. During that walk, according to Leonard's testimony, Davis told Leonard O'Neal that ". . . I [Davis] was in the car with [Joseph Lane] and [I] shot him." According to Leonard, the defendant related to him the incidents of the shooting. Leonard said that Davis told him that Jahmel was in the front seat of Lane's car, and Davis was in the rear seat. "[T]hey was driving down the street," and "Burl Davis stated that they were riding in the car and that they decided to shoot him on Penrose,"

2. Dr. John J. Thomas testified that Lane had a "penetrating gunshot wound in the center of the occipital region." A battered lead bullet was removed from the right frontal lobe. "The cause of his death was a penetrating gunshot wound of the skull and brain with traumatic intracranial hemorrhage . . . .."

but that ". . . a car distracted him. He had to turn off Holly. In doing so he [Burl Davis] shot him in the head. Jahmel grabbed the wheel and they had an accident—ran into a tree. They jumped out."

According to Leonard, Jahmel Moore was present during this conversation. During the conversation, appellant said that "they" first saw Hector that afternoon at Debra Kent's house, and while there, ". . . Hector was talking about some kind of plan he had. He [Hector] was going to get everybody who lied on him." "[S]o I guess he got him first."

Both on direct and on cross-examination, Leonard admitted that he had been arrested for two previous robberies or attempted robberies, received a five-year sentence on both charges to run concurrently, and was placed on probation. He then enlisted in the Navy. On one of these charges, Jahmel Moore was a co-defendant. Leonard pleaded guilty to these charges on September 10, and was sentenced in late October, 1973. But it was not until sometime in October, probably October 9, that Leonard informed the police of the events that transpired on June 18 involving the defendant. Leonard stated that at no time did anyone promise him anything or promise to grant him probation in return for his testimony at trial of the appellant, Davis.

On October 23, 1973, an indictment was filed charging appellant Davis with the first degree murder of Joseph "Hector" Lane. Several witnesses were endorsed. Davis was arraigned. On July 3, 1974, the state endorsed additional witnesses, one of which was Jahmel Imrod Moore.

On the second day of the trial and after Leonard had testified, the assistant circuit attorney stated to the court,

"Judge, I don't know why we are bringing him [Jahmel Moore] in for sure— while [why?] we are bringing him in at this time. I was going to call him as the next witness."

On that second day of trial, the circuit attorney informed the trial court that he had endorsed Moore as a witness but that Moore "earlier pled guilty to the same case that we have before the Court today," that Moore had "indicated . . . that he was in the car when the fatal shot was fired," and was serving a fifteen-year sentence on a charge of murder second degree for his "participation" in the "Hector" Lane shooting. The circuit attorney then requested the court to call Mr. Moore as the court's witness, since "this man has pled guilty to the crime and I was the Prosecutor in the case [and] it would be awkward, if not impossible, to put him on to vouch for his credibility, yet he was an eyewitness to the crime." The defense attorney did not specifically object, but argued that the prosecutor had endorsed Moore and that the "proper position of the Court should be the case of first impression, that it should be that since [the prosecutor] has endorsed him, he has already said that this is a witness." Eventually, the court sustained the motion of the prosecutor and called Mr. Moore as the court's witness.

Jahmel Moore then testified that he had pleaded guilty to a charge of murder—the victim being Joseph Lane—and received a sentence of fifteen years. He admitted he pleaded guilty to "acting with another" in the murder. He testified that Lane had been a friend of his and that he [Moore] was a "business associate" of the defendant, Davis. In his testimony he denied seeing Davis on June 18, 1973—"No, I didn't see him that day."[3] Jahmel Moore testified that he saw "Hector" Lane earlier in the afternoon on the fateful day, and Hector asked him where he would be later. He indicated he would be "shooting basketball." Later that evening, Lane showed up at the basketball court, and Moore got into the car with him. They drove around, and after attending a lounge, one "Billy Thompson," a friend of Lane's, got into the car with them. On direct examination, Moore testified that he had never seen Billy Thompson prior to that evening. When

---

**3.** A state's witness, Anthony Bailey, testified that he saw Moore and Davis together at Da-

vis' girlfriend's house in the afternoon of June 18.

they were all in the car, according to Moore, Hector and Billy Thompson were "arguing over some dope." Moore was seated in the front seat and Billy in the rear. "[T]hey was arguing about some dope, so I am saying, 'Man, you let me off at the corner up here.' . . ." Moore stated that on Holly Avenue, "Billy" shot "Hector" Lane. He heard "two pops." ". . . When I heard it I panicked" and jumped out of the car and went to the O'Neal home. He also said he saw Billy run ". . . contrary to where I ran. . . ." He had no idea this was going to happen. He admitted that when he went to the O'Neal home he had blood on his clothes and told Rhonda O'Neal that "Hector" got shot, but denied telling her that "Burl just shot Hector," but rather told her that "Billy Thomas" [sic] shot him. He denied telling her that "Burl" was in the back seat of the car and after Burl shot Hector that Burl jumped out of the door. He also denied hearing any statements made by Burl to Leonard while walking together. He denied having anything to do "with the planning of the murder of Hector" and any participation in the shooting, although he pleaded guilty to this offense.

After the direct examination of Moore by the prosecutor, defense counsel "cross-examined" him. In his cross-examination, Moore admitted that he was charged with first degree murder but pleaded guilty to "second degree murder" and received a fifteen-year sentence. He again denied he saw Davis that day and reiterated that "Billy Thompson" was in the automobile.

After this interrogation, the assistant circuit attorney then inquired on "redirect examination." In an attempt to impeach Moore, the circuit attorney, without objection by defense counsel, asked him about his statements made on his plea of guilty to second degree murder and read certain excerpts from his plea, including certain statements made by the prosecutor.

During this "redirect examination," Moore recalled that on March 4, 1974, he entered a plea of guilty to second degree murder for the murder of Joseph Lane and that he was represented by two attorneys. He recalled that the judge informed him he was charged with the offense of murder. He remembered the court asking him whether he wanted to withdraw his plea of not guilty and the prosecutor making a statement that the charge was reduced to murder second. The prosecutor then read from portions of the guilty plea record. He recalled that the prosecutor stated that he [Moore] was riding in an automobile driven by Joseph Lane, and that there was some understanding prior to driving around in the car.[4] He did not remember the prosecutor stating that Burl Davis was in the back seat. Further excerpts from the guilty plea were read which implicated Davis in the crime.[5] He remembered that the prosecutor stated on the plea that "Moore then fled the scene along with Davis and at a later time Moore told Leonard O'Neal and Rhonda O'Neal that he actually participated in and planned this homicide the way I have outlined it. . . ." He recalled that after the court stated, " '. . . Do I understand Davis fired the shot?' ", the prosecutor stated that " 'Davis is the one that actually fired the fatal shot. Moore is charged with acting with another.' " And he recalled the court asking him, " 'Is that substantially true or correct?' ", but his response was, " 'About my behalf.' " The trial court said, " 'Pardon?' " and the reply was, " 'About me.' " On the plea, Moore

---

**4.** [Prosecutor:] "Q You remember me also saying the following to the Court: 'Prior . to driving around in the car there was some understanding or agreement between Moore and Davis that they would have Lane drive the automobile and when both of his hands were on the steering wheel then the man who was in the back seat would pull the gun out, fire the gun and kill Lane'? Do you remember me saying that that day in Court?

A Yes."

**5.** "Q And then correct me if I am wrong. I also stated the following: 'I believe this followed almost identical to the plan. The only problem was when the gun was fired by Davis the man who was in the back seat, Lane's body stiffened and hit the gas pedal and caused the car to lunge on down the street and into another automobile.' Do you remember me stating that to the Judge?

A Yes."

had no doubts about pleading guilty. When asked at the plea, " 'Is that correct what the Circuit Attorney stated?' ", he answered, " 'Yes,' " but in his examination on this trial, he denied remembering this affirmative response.

The proceedings on the guilty plea conflicted therefore in certain respects with his testimony on "direct examination" at trial. On direct, Moore denied any part in the homicide, denied any participation in the Lane killing and yet pleaded guilty to the charge of murder as reflected in the guilty plea proceedings; on direct, he denied seeing Davis on June 18 "all day," but according to the guilty plea recalled the statements that he and Davis planned to kill Lane and that Moore fled the scene with Davis. No objections were made to this "impeaching" evidence.

The testimony of Jahmel Moore concerning the incidents on the night of June 18 was also inconsistent with the testimony of Leonard O'Neal's sister, Rhonda, a witness for the state and the former girlfriend of Jahmel Moore. During the course of the state's case and in an attempt to contradict the testimony of Moore, Rhonda stated she knew Burl Davis, Hector Lane and Jahmel Moore and was Jahmel's girlfriend for about nine months. She testified that on the night of June 18, she was at her home and Jahmel came there. When he arrived at the O'Neal home, he had a lot of blood on his T-shirt—the blood was "[w]et, liquid."

She testified that Moore told her that "him and Burl was in the car and—. . . Him and Burl was in the car and Hector was driving . . . ." "When he first came in he told me that they had shot Hector. I said, 'Who?' He [Moore] said, 'Burl had shot Hector.' . . . "[6] She also testified that Jahmel told her that ". . . they had been planning to, you know, kill him for a while." She never heard of a person by the name of Billy Thompson. She corroborated the testimony of Leonard that Jahmel made a telephone call, and on cross-examination she admitted that she did not tell the police her story until after her brother Leonard "had gotten in trouble."

The defendant introduced no evidence, except the testimony of an investigator of the Public Defender's Office who stated that he attempted to locate "Tony Bailey and Debra Kent" but never contacted them.[7]

At the close of the evidence, the defendant moved for a judgment of acquittal on the ground that the "plaintiff has failed to prove a cause of action as alleged in the Indictment." The motion was overruled. Instructions were given and the cause argued. During the first part of the closing argument, the circuit attorney reviewed the evidence, especially the testimony of Leonard O'Neal and the testimony of Rhonda.[8]

In his argument, defense counsel argued the credibility of Leonard and Rhonda

---

**6.** At this point, defense counsel objected to this statement, stating: ". . . Your Honor, not part of the statement made by Jahmel Moore, what he is doing now, that is not responsive." No objection was made that the statement was hearsay. Counsel did object on the grounds of hearsay to an earlier question—"Did he [Jahmel] tell you how that shirt became bloody?"

**7.** Anthony Lee Bailey, of course, testified at trial. Debra Kent did not.

**8.** "[Prosecutor]: Thank you, Your Honor. Now, it is very interesting, with Imrod Moore, you see, he takes the stand, he will tell you—he is honest about this. He says they are close friends. Imrod Moore right now is up in Moberly in the penitentiary. . . .

　　　　·　　　·　　　·

"He gets on the stand, he can tell you what he wants to tell you. This man is his friend, so

the first time anyone hears of Billy Thompson is on this stand here—first time.

"Now, we already know that the defendant Davis himself told O'Neal that he did it and described it in detail. The detail was identical to what Imrod Moore told you except for one thing, changing the name of the man in the back seat.

"Rhonda takes the stand. Rhonda told you that they were sweethearts—high school sweethearts—Rhonda O'Neal and Imrod Moore when they were in school. They dated and Imrod had conferred and related all these things to Rhonda at the time of the shooting that night when he went over there with a bloody shirt and he told her that, 'We shot Hector. We got him.' She said, 'Who do you mean?' Imrod Moore told her, 'Burl and I, we shot him. Burl was in the back seat. Burl had the gun. Burl shot him in the head. We got him.'

O'Neal's testimony—how Leonard didn't tell the police until October, ". . . until after he had been arrested on his two armed robberies." Defense counsel then discussed the testimony of Moore,[9] and argued that there was a reasonable doubt as to the guilt of Davis.

Then in the second portion of his argument, the prosecutor emphasized the fact that Leonard O'Neal had pleaded guilty in September, 1973, before he had told the police about the events of June 18, so as to bolster the believability of Leonard's testimony, and he also argued the credibility of the direct testimony of Jahmel Moore. He argued that during the trial he had read from the transcript of Moore's plea of guilty to the killing of Lane, which implicated Davis.[10]

After the argument, and after deliberation, the jury found the appellant guilty of murder in the first degree and assessed his punishment at life imprisonment. In proper time, a motion for new trial was filed. No point was raised in the motion for new trial that the court erred in permitting the prosecutor to argue the probative value of the testimony of Moore because such evidence was impeachment evidence only and could not be used as substantive evidence.

The court overruled the motion. After allocution was granted, the defendant was sentenced to life imprisonment.

### III

#### Appellant's Contentions on Appeal

On this appeal, the appellant-Davis makes several points. He contends that (1)

"I asked Rhonda, 'Have you ever heard of Billy Thompson?' She said, 'No.' Was that name mentioned that night? No, it wasn't mentioned because the man Billy Thompson, if there is such a person, didn't do it. It is that easy, that simple and that clear."

9. "All right. Jahmel Moore's testimony, he was just beautiful. We have a man who has been convicted of two armed robberies . . , a man who has admitted his part in this murder, but, of course, he wasn't convicted of murder in the first degree. You have an instruction of acting together—acting with another. One is as guilty as the other. . . . He pled guilty.

"Now, [the prosecutor] brought in the transcript of Jahmel's plea. [He] recited the facts as at every plea the State does. If you recall the Court asked him in that plea, 'Are these facts correct?' And he [Jahmel] says, 'Yes, to me.' And they wanted him to say under oath that day that Lee Burl Davis pulled the trigger and he wouldn't say it because Lee Burl Davis didn't do it. He wouldn't say it in here."

10. "Now, I had read from the transcript when Jahmel pled guilty and you will recall, I am sure, that I read it, a rather lengthy statement that I had given to the Court, Judge Scott, as to the facts surrounding the case. You have heard it. It is the facts in the case. In that lengthy statement I told the Court that it was my understanding [that] Jahmel Imrod Moore was in that front seat and that he, along with Burl Davis, planned the murder and that Burl was in the back seat and that Burl Davis pulled the trigger. What followed, the Court asked him basically, 'Is that true?' And his answer— Mr. Moore's answer first was, 'About my behalf.'

"When I was questioning the man I wasn't trying to lead him. It was confusing to him. It is an awkward phrase, 'About my behalf,' in other words you are getting at that point that he was trying to limit himself to—he was trying to avoid, in front of Judge Scott, to implicate this friend of his, that was his first statement, 'About my behalf.' The judge didn't understand. He said, 'Pardon?' And Moore repeated, 'About my behalf.'

"Now, they go on. They asked him all these questions about his rights and they wanted all these things. And then you bear with me here. Okay. Then we come down after that, the Court says, 'Pardon?' Mr. Moore says, 'About me?' The Court says, 'Yes, about any of it that he stated.' 'He' is the prosecutor, that is me. I had just got done stating all these facts, including that this man was involved. He said 'Yes, any of it that he stated.' 'Do you have any doubts about wanting to plead guilty here?' 'No, I don't have any doubts.' The Court: 'Is that correct what the circuit attorney said?'

"Now, the common, plain meaning of the English language would be to turn back and see what I stated, and what I stated was that Davis was involved in this thing and his answer, I read it to him in the court the other day; I will read it again. The Court says, 'Is that correct what the circuit attorney stated, Mr. Moore?' 'Yes.' So, I don't think it is quite true to say that Mr. Moore did not, at least at one point in time, admit that Davis was the one that pulled the trigger.

"We know he did it. He told Rhonda. We know that Leonard O'Neal was present. And there in front of Judge Scott he again said, yes, what the circuit attorney said was true.
. . . ."

the trial court erred in calling Jahmel Moore as a court's witness because in doing so this permitted the prosecutor to introduce "inadmissible, incompetent evidence to the jury under the guise of impeachment, to the prejudice of the defendant"; (2) the trial court improperly permitted the prosecutor to impeach Jahmel Moore by examining him with regard to the guilty plea proceedings because (a) Moore was not an "adverse" witness within the meaning of the rules permitting such impeachment, and (b) because the jury was allowed to consider incompetent statements made by the "prosecutor" at the time of the guilty plea [11]; (3) the trial court improperly permitted the prosecutor to impeach Jahmel Moore "by the use of prior inconsistent statements he allegedly made to Rhonda O'Neal" because the prosecutor was not "surprised" by his testimony denying defendant's participation in the offense and "because the impeaching [12] testimony was incompetent hearsay"; and (4) "plain error" was committed when the prosecutor in closing argument argued (a) that "the jury should accept Rhonda O'Neal's impeaching testimony as substantive evidence" and (b) that "the jury should accept as fact the prosecutor's statements made at the time of Moore's guilty plea proceedings."

### IV

#### The "Argument" as Substantive or Impeachment Evidence

We shall examine these contentions in inverse order. The first and primary contention to be resolved, in our opinion, is whether the closing argument of the prosecutor in referring to the testimony of Rhonda O'Neal and the statements on Moore's guilty plea which were inconsistent with his statements in his "direct examination" were used as substantive evidence and constituted "plain error." We conclude that the comments concerning the facts on the guilty plea and the comments on the statements made by Rhonda were not used merely as impeaching evidence but were used as substantive evidence to show the truth of the matters asserted and constituted plain error.

The whole issue of whether impeaching or discrediting testimony of a witness who is not a party is competent as substantive evidence to show the truth of the matters asserted therein has been fully discussed recently in *State v. Granberry*, 491 S.W.2d 528 (Mo. banc 1973).

■ In that case, a witness for the state and a co-indictee of the defendant denied on direct examination that the defendant was with him. The state claimed surprise and was given leave to ask the witness about prior statements which implicated the defendant as a participant in the crime. In closing argument to the jury, the prosecutor stated:

"I suggest to you that there is something to be gained from Hackett's [the witness] testimony. . . . Hackett said five times . . . that James Granberry went inside, and he said that he was along, and he was in that car that night, and he committed the robbery. . . ."

Our Supreme Court reversed the conviction and concluded

" . . . on the record in this case that the prior statements attributed to witness

---

11. We infer from this that the appellant contends that in effect the prosecutor was " 'really testifying' " in the case and hence error was committed. In the reply brief, appellant contends that the principal argument in the "main brief" is "that a trial court commits error when it calls a person as its own witness and then permits the prosecutor, under the guise of impeachment, to introduce in evidence statements of the prosecutor himself implicating the defendant . . . statements wherein the prosecutor himself is 'really testifying' . . .."

12. We take this to refer to both the impeaching evidence of Moore relating to the guilty plea proceeding and Rhonda's impeachment of Moore in which she related that Moore told her that Burl had shot Lane after Moore testified he told Rhonda that Billy Thomas [Thompson] shot Lane. On oral argument, counsel contended that the testimony of Rhonda to the effect that Moore told her that Burl shot Lane was hearsay and hence inadmissible.

Hackett were not used by the State to impeach Hackett's credibility but, on the contrary, were used as substantive evidence to show the truth of the matters asserted in such statements given by Hackett on prior occasions. . . . " *State v. Granberry*, supra, 491 S.W.2d at 530.

The court concluded that the "judgment of conviction cannot be permitted to stand." Finch, J., in his opinion concurring in the result, stated:

"The principal opinion herein . . . holds that these prior inconsistent statements by [the witness] were admissible to impeach or discredit him as a witness, but were not admissible and competent as substantive evidence of the facts to which such statements related. The opinion concludes, based on analysis of the prosecuting attorney's argument to the jury, that the statements were used as substantive evidence to show the truth of the statements that [the defendant] was present and participated, and *that for this reason* the conviction cannot be allowed to stand." *State v. Granberry*, supra, 491 S.W.2d at 534. (Emphasis added.)

The Supreme Court in *Granberry* adhered to the "orthodox" rule that

" '[t]he general rule is almost universally recognized that evidence of extrajudicial statements made by a witness who is not a party and whose declarations are not binding as admissions is admissible only to impeach or discredit the witness, and is not competent as substantive evidence of

the facts to which such statements relate.' " *Granberry*, supra, at 530, quoting from 133 A.L.R. 1454 at 1455 (1941).[13] While a prosecutor is entitled to argue evidence for impeachment purposes, *State v. Manley*, 513 S.W.2d 703, 705 (Mo.App.1974), we believe that the issue presented here is controlled by *State v. Granberry*, supra. Except for the fact that Moore was called as a court's witness, the facts here are very similar to *Granberry*, and, hence, we believe *Granberry* is controlling. The argument in *Granberry* used impeaching statements as substantive evidence. That is also the situation here.

It is difficult if not impossible to expect the jury to give the statements commented upon by the prosecutor in his argument the limited value for impeachment purposes. The more logical conjecture is that the jury would give weight to the statements commented upon in argument and consider them as substantive evidence on the issue of guilt of the defendant.[14] A jury cannot be expected to sift the fine distinctions between what constitutes substantive evidence and what is impeachment. As long as the orthodox rule is adhered to by our Supreme Court, we are bound thereby, and on that basis, we must reverse.

Appellant candidly admits that there was no objection to the prosecutor's arguments and that there was no claim of error in this regard in the motion for new trial. Appellant requests us to consider the argument as plain error.

 Rule 27.20(c) authorizes us to consider "plain error" affecting substantive

---

**13.** See also the argument of the prosecutor in *State v. Woodard*, 499 S.W.2d 553, 564 (Mo. App.1973).

A comprehensive analysis of the arguments pro and con to the adherence of the orthodox view was made in the separate opinions of Donnelly, J., Seiler, J., concurring, and Finch, J., concurring in result. See also the authorities cited in the opinion of Finch, J., and the discussions in *State v. Kinne*, 372 S.W.2d 62, 68 (Mo.1963); *Woelfle v. Connecticut Mut. Life Ins. Co.*, 234 Mo.App. 135, 151, 112 S.W.2d 865, 874 (1938); *Pulitzer v. Chapman*, 337 Mo. 298, 85 S.W.2d 400, 411 (1935); Annot., 133 A.L.R. 1454, supra, at 1455; 3A Wigmore, Evidence,

§ 1018 (Chadbourn rev. 1970); McCormick, Evidence, §§ 34, 39 and 251 (2d ed. 1972).

**14.** For example, the prosecutor said:

"Now I have read from the transcript when Jahmel pled guilty and you will recall, I am sure, that I read it, a rather lengthy statement that I had given to the Court, . . . as to the facts surrounding the case. You have heard it. It is the facts in the case. In that lengthy statement I told the Court that it was my understanding Jahmel Imrod Moore was in that front seat and that he, along with Burl Davis, planned the murder and that Burl was in the back seat and that Burl Davis pulled the trigger. . . . "

rights when the court "deems that manifest injustice or miscarriage of justice has resulted therefrom." Our Supreme Court has held that the plain error rule does not cover all trial errors and has declined to delineate the precise bounds for applying it. *State v. Mabery*, 437 S.W.2d 91, 93 (Mo.1969); *State v. Embry*, 530 S.W.2d 401, 404 (Mo.App. 1973). The plain error rule should be exercised "sparingly," *State v. Sockel*, 490 S.W.2d 336, 339 (Mo.App.1973), and cannot be used as a vehicle for review of every alleged trial error which is not asserted or properly preserved for review. *State v. Murphy*, 521 S.W.2d 22, 25 (Mo.App.1975). The rule is limited, and in order to justify its application, it must appear that there is a sound, substantial manifestation and a clear showing that injustice or a miscarriage of justice results if the rule is not invoked. *State v. Halk*, 524 S.W.2d 44, 48 (Mo.App.1975); *State v. Murphy*, supra, 521 S.W.2d at 25; *State v. Meiers*, 412 S.W.2d 478, 480–481 (Mo.1967). And, ordinarily, alleged errors on closing argument or in cross-examination of defense witnesses do not justify relief as plain error unless they are determined to have had a decisive effect on the jury. *State v. Collins*, 520 S.W.2d 155, 157 (Mo.App.1975).

In *Granberry*, supra, it is not clear whether timely and proper objections were made to the argument of the prosecutor. The implication is that there were none. The court, however, did reverse and remand without discussing whether the issue was preserved or whether the plain error rule was applicable.

■ In view of this state's adherence to the *orthodox view*, above, we are compelled to conclude that the argument, in our opinion, used impeaching evidence as substantive evidence of facts to which the statements relate and had a decisive effect on the jury; hence, it constituted plain error.

The state argues in its brief that the argument of the prosecutor was retaliatory. While portions of the argument may have been retaliatory, the overall comments and the thrust thereof were not. Based on the whole of the argument, we hold that it was not basically retaliatory.

Based on our conclusion that the comments of the prosecutor on the impeaching statements of Moore and Rhonda O'Neal were used as substantive evidence to show the truth of the matters asserted in such statements and not merely as impeaching evidence, so as to constitute plain error, we are compelled to reverse the judgment of conviction and remand the cause for a new trial.

Since the cause must be reversed and remanded, we shall briefly examine the other errors raised by the appellant, since they may reoccur.

## V

### *Authority of Court to Call Witness*

Appellant contends that the trial court erred and abused its discretion in calling Jahmel Moore as its witness, since this action permitted the prosecutor to introduce "inadmissible" evidence under the guise of impeachment. We do not agree.

■ Normally, it is the function of the parties to call witnesses as a part of our adversary process. The practice in criminal cases of calling a person as a court's witness is seldom used and "not particularly desirable." *Smith v. United States*, 331 F.2d 265, 273 (8th Cir. 1964). While our research fails to disclose any previous Missouri decision in which the court called a witness in a criminal proceeding,[15] the general rule is that a trial judge, in a criminal case, may in the exercise of sound judicial discretion call a witness as the court's witness. *Smith v. United States*, supra, 331 F.2d at 273; An-

---

15. There are several Missouri decisions dealing with civil cases in which this procedure is recognized. *Townsend v. City of Joplin*, 139 Mo. App. 394, 123 S.W. 474 (1909)—"A judge, in the discharge of his duties, may call and examine witnesses in furtherance of justice . . .." 123 S.W. at 477; *Gosnell v. Gosnell*, 329 S.W.2d 230, 235 (Mo.App.1959); *Chilcutt v. Baker*, 384 S.W.2d 854, 860 (Mo.App. 1964); *Maryland Casualty Co. v. Spitcaufsky*, 352 Mo. 547, 178 S.W.2d 368, 372 (1944).

not., 67 A.L.R.2d 538, 540 (1959); 58 Am. Jur., Witnesses, § 4 (1948).

All of the authorities which have dealt with the issue recognize that calling a witness as the court's witness rests in the sound discretion of the court. *People v. Ricks*, 86 Ill.App.2d 70, 230 N.E.2d 50, 52 (1967); *People v. Shelton*, 388 Ill. 56, 57 N.E.2d 473, 477 (1944); *Carle v. People*, 200 Ill. 494, 66 N.E. 32, 36 (1902); *Smith v. United States*, supra; *Litsinger v. United States*, 44 F.2d 45, 47 (7th Cir. 1930); 9 Wigmore, Evidence, § 2484 (3d ed. 1940).[16] In fact, under certain circumstances, it is necessary and imperative for the court to do so. But, " . . . in exercising this power, a wise discretion should be utilized, not only as to whether witnesses should be called by the court itself, but also as to the extent and manner of the examination permitted. . . . " *Commonwealth v. DiPasquale*, 424 Pa. 500, 230 A.2d 449, 451 (1967).

Based upon well-recognized authorities, we believe that (1) the trial court has discretion in a criminal case to call a witness as its own, (2) the practice should be sparingly used, since it is not a desirable one, (3) the practice should be restricted to cases where otherwise there may be a miscarriage of justice and (4) before a witness is called by the court a proper foundation be laid which would consist of the reasons why the party desiring the witness to testify cannot vouch for his veracity and a showing that the testimony relates to the issues in the cause.[17]

We cannot conclude here that the trial court erred or abused its discretion in calling Jahmel Moore as the court's witness. The situation here is akin to *Smith v. United States*, supra, where no abuse of discretion was found.[18] In *Smith*, the court's witness was a coindictee, he had pleaded guilty, the witness possessed information pertinent to the issues against the defendant, and it was "natural" that the government should have been "hesitant" about sponsoring the witness. It was not unreasonable, therefore, for the government to request the trial court to designate the witness as the court's witness.[19]

Under the circumstances, here, therefore, we hold that the trial court did not abuse its discretion in calling Jahmel as the court's witness. The prosecutor informed the court that Moore had pleaded guilty to the crime, that he was the prosecutor in the case and that it would be " . . . awkward, if not impossible, to put him on to vouch for his credibility, yet he was an eyewitness to the crime." [20]

## VI

### *Impeachment of "Adverse" Witness*

Appellant contends in his Points 1(a) and (b) that the court erred in permitting the

---

**16.** Cf. *People v. Bennett*, 413 Ill. 601, 110 N.E.2d 175 (1953), relied upon by the appellant. There the court held that it was error for the court to call a witness only upon a showing that he was present and he refused to speak to the prosecutor. This case was distinguished in *Smith v. United States*, supra, 331 F.2d at 273.

**17.** See the procedure followed in *People v. Gordon*, 252 N.E.2d 562, 565 (Ill.App.1969).

**18.** See also *People v. Gordon*, supra. Court could call witness who was eyewitness, hostile and for whom prosecution was unable to vouch.

**19.** Appellant relies on *People v. Krejewski*, 332 Ill. 120, 163 N.E. 438 (1928). There, the Illinois Supreme Court reversed a conviction on the ground, inter alia, that the trial court allowed the state to impeach a court's witness by introducing his statements made to another to the effect that the witness said that the police had the right man. The court held that it was not competent for the state, under the guise of impeachment of the court's witness, to introduce hearsay statements made out of the presence of the defendant that the witness had identified the defendant. That case is distinguishable. The witness in *Krejewski* was not a participant in the offense but a customer in the store which was robbed. Secondly, it seems that Illinois law holds that a witness cannot be impeached by showing inconsistent hearsay statements made out of the presence of the defendant. That is not the law in Missouri.

**20.** However, on retrial it may be unwise to call Moore as the court's witness or a witness on behalf of the state for the reason that on retrial the only purpose of putting him on the stand, now knowing what his testimony will be, would be to bring his impeaching testimony before the jury for its substantive value.

prosecutor to impeach Moore by examining him with regard to the guilty plea because he was not an "adverse" witness within the meaning of the authorities permitting such impeachment and because the jury was permitted to hear and consider the statements of the prosecutor at the guilty plea. He further contends that the statements Moore made to Rhonda O'Neal should not have been allowed to be introduced because the prosecutor was not "surprised" by Moore's testimony and that the admission of Rhonda's testimony was error, since it was hearsay. He argues that the trial court "should have awaited the development of testimony, if any, which would have provided a sufficient basis for treating [Moore] as an adverse or hostile witness. . . ." Although all these points were not properly preserved for review and therefore not before us for consideration, we make a few comments concerning them.

■ The principles relied upon by the appellant are applicable when a witness is called by a party, but we believe they are not dispositive when a witness is called by the court. It is not necessary, as appellant contends, to "have awaited the development of testimony" to determine whether the witness was adverse or hostile, or that the prosecutor be "surprised" by the testimony when the court exercises its sound discretion in calling a court's witness.

■ Appellant relies upon a number of authorities[21] for his contention that the court erred in permitting the impeachment of Moore because he was not an "adverse" witness within the meaning of the rule permitting impeachment, and the jury was allowed to hear and consider the statements made by the prosecutor on the guilty plea proceeding.

■ But the authorities relied upon by appellant are not dispositive of the issues on this record. It is true that when a witness is called by a party, there is a distinction to be made between the mere failure of the witness to prove a fact for which he was called and where the witness actually becomes "adverse" or "hostile." *State v. Bowen*, supra, 172 S.W. at 368. The distinction has been succinctly stated in *State v. Hogan*, supra, 177 S.W.2d at 466:

" 'We held in the case of *State v. Bowen*, 263 Mo. [279] loc. cit. 280, 172 S.W. 367, that it is not sufficient to warrant a party who puts a witness on the stand, in impeaching such witness . . ., that the witness merely fails or refuses to tell the facts which he had theretofore related extrajudicially or fails to tell all such facts, but in order to warrant impeachment in the mode stated, the witness must go further, and by relating wholly contradictory facts become in effect a witness for the adverse side. In the latter event the party calling the witness is entitled to show that he was misled and entrapped by the witness' former words and attitude into calling the adverse witness. . . .' *State v. Drummins*, 274 Mo. 632, 204 S.W. 271."

These decisions do not aid appellant. First, Moore did not merely fail to tell facts; he related wholly contradictory facts from the facts in the plea of guilty and in effect became a witness for the other side. Secondly, Moore was not called as a witness by the State but was called as the court's witness. Hence, the principles established in the authorities relied upon are not dispositive of the issue presented here.

Appellant relies upon *People v. McKee*, 39 Ill.2d 265, 235 N.E.2d 625 (1968), and *People v. Dandridge*, 120 Ill.App.2d 209, 256 N.E.2d 676 (1970). In these cases, the convictions were reversed for the apparent reason that the admissions of an alleged accomplice under the guise of impeachment constituted error ". . . for the reason that such evidence is not competent even for the pur-

**21.** Among which are *State v. Hogan*, 352 Mo. 379, 177 S.W.2d 465 (1944); *State v. Rogers*, 473 S.W.2d 710 (Mo.1971); *State v. Bowen*, 263 Mo. 279, 172 S.W. 367 (1915); *Woelfle v. Connecticut Mut. Life Ins. Co.*, supra; *Carlson v. First National Bank of Kansas City*, 355

S.W.2d 928, 931 (Mo.1962)—general rule is that party may not call a witness and then impeach him merely because his evidence turns out to be unfavorable or unsatisfactory; see also *State v. Drummins*, 274 Mo. 632, 204 S.W. 271 (1918).

pose of impeachment where the statement bears directly upon defendant's guilt or innocence. . . ." *People v. McKee*, supra, 235 N.E.2d at 628. The apparent thrust of these decisions is that in our sister state it is not competent for the state to introduce inconsistent hearsay statements made out of the presence of the defendant, even for the purpose of impeachment, where the defendant has not vouched for the statement.

In Missouri, however, it is settled that prior inconsistent statements of a witness are admissible to impeach or discredit a witness to affect credibility. *State v. Atkins*, 494 S.W.2d 317, 320 (Mo.1973); *State v. Granberry*, supra, 491 S.W.2d at 534. Impeachment is not improper in this state on the ground that the impeaching statements are hearsay or that they implicate the defendant in the commission of a crime, or are made out of the presence of the defendant. *State v. Yowell*, 513 S.W.2d 397, 405 (Mo. banc 1974); *State v. Covington*, 432 S.W.2d 267, 269–270 (Mo.1968); *Thomas v. State*, 512 S.W.2d 116, 123 (Mo. banc 1974). We do not believe that the state should be barred from showing inconsistent statements, even though such prior inconsistent statements implicate the defendant or are hearsay. To bar the state would mean that a witness could deny any participation in the offense and bar any possibility of the state to discredit the credibility of a witness. Without impeaching evidence, the testimony of the witness would be highly beneficial to the defendant. While the defendant is entitled to a fair trial, so is the state.

But, as in the exercise of its sound discretion in calling a witness as its own, the court should utilize its sound discretion as to the extent and manner of the examination of the witness and the impeaching testimony. It was proper to permit the impeachment of Moore by the statements on the guilty plea and to Rhonda O'Neal after Moore denied certain facts in his "direct examination" by showing inconsistent statements made on the guilty plea and to Rhonda, but such extensive and pervasive impeachment by reading the totality of the record of the guilty plea may not be necessary to affect the credibility of the witness.

Appellant contends that there was error because the jury was allowed to hear and consider the statements made by the prosecutor on the guilty plea proceeding so that in effect the prosecutor was "really testifying." *State v. Hogan*, supra, 177 S.W.2d at 466; *State v. Rogers*, 473 S.W.2d 710, 713 (Mo.1971). But there is no infirmity if portions of a guilty plea are read and it factually recounts what occurred on the guilty plea. *State v. Rogers*, supra, relied upon by the appellant is factually distinguishable.

Hence, we believe that, under Missouri law, a witness may be impeached by means of a guilty plea or other impeaching testimony, even though such statements may be hearsay, are not made in the presence of the defendant and implicate the defendant who is on trial. Such impeaching evidence, however, should, of course, be limited to its legitimate purpose of impeachment and should not be used as substantive evidence to show the truth of the matters asserted in such statements. A limiting instruction, MAI 3.52, may be requested or given,[22] and the jury informed of the distinction.

## VII

### Conclusion

We have thoroughly reviewed the transcript, the extensive briefs of the appellant

---

**22.** It is to be noted that failure to request a limiting instruction, MAI 3.52, has been held not to constitute plain error under Rule 27.-20(c). *State v. Taylor*, 472 S.W.2d 395, 402 (Mo.1971); *State v. Martin*, 411 S.W.2d 241, 242 (Mo.1967).

But Rule 20.02(a), adopted May 18, 1973, states that ". . . MAI–CR instructions in the 3.00 Series may be given by the court without a request therefor and shall be given where applicable if requested in the manner provided in this Rule." MAI–CR, p. VIII. Compare *Commonwealth v. DiPasquale*, supra, 230 A.2d at 450.

and the state and the numerous authorities relied upon therein, and we are convinced that under the facts of this case the cause should be reversed and the defendant be given a new trial.

The judgment of conviction is reversed and the cause remanded for further proceedings.

MORGAN, C. J., and TURNAGE, Special Judge, concur.

BARDGETT, J., concurs in result in separate opinion filed.

SEILER, J., concurs in result and concurs in separate opinion of BARDGETT, J.

DONNELLY, J., concurs in result.

FINCH, J., dissents in separate dissenting opinion filed.

HENLEY, J., dissents and concurs in separate dissenting opinion of FINCH, J.

RENDLEN, J., not sitting.

BARDGETT, Judge, concurring in result.

I concur in result because I agree that the case must be reversed and remanded for a new trial. But my reason for doing so is that it was, in my opinion, error for the court to have called prosecution witness Jahmel Imrod Moore as the court's witness in this case.

The opinion seems to suggest that the reason given by the prosecutor when he requested the court to call Moore as the court's witness was sufficient, but footnote 20 seems to suggest that the element of surprise is necessary before such action is at all justified. Additionally, there is the suggestion that the defense did not make an adequate objection. Thus, I am not at all sure as to what the criterion is or will be in Missouri for this action. In any event, the fact that a state's witness (codefendant here) has pled guilty to the offense in a case handled by the same prosecutor is a usual occurrence. It happens frequently, if not at least weekly, in our larger circuits and particularly when the prosecutor makes a deal with a codefendant to obtain his testimony in return for the prosecutor's making a

favorable recommendation to the court sentencing the witness. In less populous circuits or counties where the elected prosecuting attorney is the only prosecutor, it will happen every time one codefendant pleads guilty and then testifies for the state.

I regard the "reason" given by the prosecutor as simply an "excuse" to invoke a procedure whereby he can get a prior inconsistent statement before the jury and hope the jury consider it as substantive evidence of defendant's guilt.

I concur in result.

FINCH, Judge, dissenting.

I agree with much of the principal opinion. However, I disagree with the portion thereof which concludes that for certain trial errors this conviction should be reversed and remanded. Hence, I must respectfully dissent.

The principal opinion reverses and remands on the basis that certain evidence was improperly admitted in evidence and that the prosecutor made improper argument concerning such evidence in his closing argument to the jury. Defendant made no objection at trial to the introduction of the evidence in question and made no objection to counsel's argument which the principal opinion holds to be reversible error. Instead, counsel for defendant argued this same evidence to the jury, pointing out portions thereof deemed to be favorable to defendant.

Defendant's motion for new trial was silent on both of these questions. No objection to the admission of the evidence in question or the argument thereof to the jury is mentioned. It is first raised on appeal.

The principal opinion concludes that these matters are plain error for which a new trial should be granted. I disagree. These are not the type of trial errors for which this court has granted or should grant a new trial. The principal opinion relies on *State v. Granberry*, 491 S.W.2d 528 (Mo. banc 1973). However, *Granberry* did not

reverse on the basis of plain error. The opinion therein contains no mention of Rule 27.20(c) nor does it hold that what occurred in that case constituted plain error.